Mr. Justice CLIFFORD
 

 delivered the opinion of the court.
 

 This is an appeal from a decree of the Circuit Court of the United States for the District of Rhode Island, in a cause of seizure and forfeiture.
 

 The libel of information against the bark Reindeer and her cargo, was filed in the District Court on the seventh day of August, 1861, and the transcript shows that it contains twenty counts, founded upon various provisions contained in the several acts of Congress, prohibiting the slave-trade. But the material charges to be considered in this investigation are the following:
 

 1. That the vessel was, on the twenty-sixth day of January, .1861, by some person, being a citizen of the United States, or residing within the same, for himself or for some other person, either as master, factor or owner, fitted, equipped, and prepared within the port of New York, for the purpose of carrying on trade or traffic in slaves to some foreign country, or for the purpose of procuring from some foreign kingdom, place or country, the inhabitants thereof to be transported to some foreign country, port or place, to be sold and disposed of as slaves.
 

 2. That the vessel being owned by a citizen of the United States, was by him at the time aforesaid, for himself as owner, fitted, equipped, loaded, and prepared in the port of New York, for the purpose of procuring negroes, mulattoes, or persons of color, from some foreign kingdom, place, or country, to be transported to some other port or place, to be
 
 *394
 
 held, sold, or otherwise disposed of as slaves, contrary to the form'of the statute in such case made and provided.
 
 *
 

 Process was forthwith issued and duly served on the same day, and on the twenty-eighth day of the same month, Gregorio Tejedor appeared as claimant. Referring to the claim as exhibited in the record, it will be seen that he averred under oath that he was the true and
 
 bond fide
 
 owner of the cargo and the charterer of the vessel, and the record also shows that he was allowed to make defence. Claim was also duly filed by the appellants. They allege in substance and effect, that the vessel was owned by one Pierre L. Pearce, and they base their claim to the vessel and cargo upon the ground that the first-named appellant, as the sheriff of the county of Newport, held the same, at the time of the seizure by the marshal, under certain writs of attachment issued in favor of the other appellants against the owner of the vessel from the State court, and consequently, they insist that the District Court had.no jurisdiction of the case.
 

 No claim was ever filed by the owner of the vessel or by any other person in liis behalf. Testimony .was taken, on both sides in the District Court, and after the hearing, a decree was entered condemning both the vessel and cargo as forfeited to the United States. Claimant of the cargo and the present appellants appealed to the Circuit Court of the United States for that district.
 

 Subsequently, they were heard in the Circuit Court upon the same evidence, and after the hearing, a decree was entered affirmmg the decree of the District Court. Whereupon, the claimants under the attachment suits appealed to this court, and now seek to reverse the decree, upon the ground that the possession of the sheriff was prior to that of the marshal,-and that such prior possession has the effect to defeat the jurisdiction of the Federal courts.
 

 I. — 1. Parties who have not appealed, are not entitled to be heard in this court, except in support of the decree in the
 
 *395
 
 court below. They cannot ask for a reversal in the appellate court, and consequently the only questions really before the court are those presented by the appellants as attaching creditors of the owner of the vessel. Appeal not having been taken by the claimant of the cargo, he must be understood as having acquiesced in the correctness of the decree entered by the Circuit Court; and it has already been stated that the owner of the vessel never made any claim. Remark should be made, that during the hearing in the District Court, the "Vice-consul of the Queen of Spain, resident at Boston, professing to intervene “for the Government of her Catholic Majesty,” filed a claim for the vessel and cargo as the property of Gregorio Tejedor, but it does not appear that the claim was ever prosecuted, and inasmuch as no appeal was taken, either to the Circuit Court or to this court, it is unnecessary to comment further upon that subject.
 

 2. Appellants allege that Pierre L. Pearce, of the city of New York, was the owner of the vessel, and the proofs fully sustain the allegation. Proofs also show that the bark was a vessel of two hundred and forty-eight tons, with one deck and three masts. Her register shows that she was a hundred feet .in length, and thirty-five feet in breadth, and that she was eleven feet in depth; and the proofs also show that her construction and arrangement were well suited for the illegal traffic in which it is alleged she was engaged. Prior to the sailing of the vessel, she ivas placed qn the dry-dock and calked, resheathed, and otherwise repaired and fitted for the projected voyage. After being fully repaired, she was advertised for a voyage to Havana by James E. Ward & Co., shipping and commission merchants, acting as the agents of the owner. Under those auspices she cleared from the port of New York, and sailed for Havana, on the twenty-sixth day of January, 1861, where she arrived on the twentieth of February following.
 

 Her shipping articles describe the voyage as one from the port of New York to one or more ports in Cuba, from thence to one or more ports in Europe,
 
 if required,
 
 and back to a port of discharge in the United States, or from Cuba back
 
 *396
 
 to the United States. Ship’s company, as appears by the crew-list, consisted of the master, William H. Cunningham, two mates and seven seamen, all of whom were on board at the time - of the seizure, except four of the seamen who deserted-in Cuba, and whose places were immediately supplied by the master. They were shipped for a voyage from Havana to Falmouth, from thence to one or more ports of Europe and back to a port of discharge in the United States.
 

 Counsel of the United States contend that the vessel was evidently fitted, equippedj and otherwise prepared and caused to sail from the port of New York to Havana, with the ultimate purpose that she should proceed to the west coast of Africa to engage in the slave-trade. As supporting that theory, they refer to the construction and arrangement •of the vessel, aud to the fact that the crew were shipped not for Havana, but for a voyage from New York to one or more ports in Cuba, and from thence to one or more ports in Europe, and back to a port of discharge in the United States, or from Cuba back to the United
 
 States;
 
 and they also refer to the repairs put upon the ship, as tending to show that she was intended for a long voyage.
 

 Reference is also made to the fact that the owner, although in the shipping-business himself, employed J. E. Ward & Co. to put the vessel up, and also to the fact that they -advertised and despatched her as his agents. They shipped part of the cargo, and the manifest shows that their shipment included one box and twenty-two packages of hardware, and fourteen thousand seven hundred pounds of
 
 tasajo,
 
 or dried beef, which it is proved comes from Buenos Ayres,-ánd is not an article of shipment from New York to Havana, but. is an article imported into Cuba from South America, and is largely used for feeding negroes..
 

 The vessel laid at Havana over four months before she, received her cargo. She was consigned to the house of Perez & Martinez,- and the latter testifies that all her cargo from'New York was duly unladen and delivered. During all that time the master and the crew remained on board, drawing full wages, except the four who deserted, and their
 
 *397
 
 places were immediately supplied. Pearce, the owner of the vessel, arrived at Havana on the fifth of March, 1861, and the proofs show that he remained there until the‘sixth day of May following.
 

 8. Theory of the claimant of the cargo in the court below, was that the owner went there to sell the vessel, and that he actually made a contract to sell her to the claimant for the sum of seven thousand dollars, which was not carried into effect; that the claimant failing to make the purchase, subsequently chartered the vessel for the term of three years, for the sum of eight thousand five hundred dollars. He produced a charter-party, which is to that effect, bearing date on the twenty-third day of March, 1861, executed while the vessel was laying at Havana.
 

 Expenses for repairs, wages of tbe master and crew, and expenses for provisions- and all other expenses, were to be borne by the charterer, but there was no change in the shipping articles, or in the crew-list, or in any of the ship’s papers. On the contrary, the voyage went on as it was begun at New York, and the same officers and crew remained on board till the vessel was seized as hereinafter explained. One of the consignees of the vessel testifies that- his firm, Perez & Martinez, afterwards loaded the vessel for the alleged charterer, and he states that the entire, cargo was put on board under permits from the custom-house, but the list of the cargo taken from the vessel, shows that a large quantity of articles, specially suited to the slave-trade, were not on the manifest, and consequently it is highly improbable that they were put on board under the sanction of public authority.
 

 Articles not oh the manifest embrace sixty-five water-pipes, casks of high-colored paint, pickled fish, coarse salt, two barrels of lime, four jars of chloride of lime, cases of medicines, medicinal herbs and-lint, coarse sponges, and one demijohn of disinfecting fluid. Her manifested cargo, also, is of the same criminating character. Among the articles arc, one nundred and seventeen pipes of rum, and sixty-five half pipes, sixteen pipes of biscuit, eight thousand seven hundred
 
 *398
 
 and foi’ty pounds of
 
 tasajo,
 
 and one bale and nineteen packages of hardware, besides wine, brandy, gin, and two hundred oars. Part of the cargo, innocently described in the manifest as hardware, consisted of saucepans, cooking-pans, casks containing iron chains, padlocks, and war-knives.
 

 All of these articles are proved to be used in the slave-trade, and it is difficult to resist, the conclusion, that they were all exported from the port of New York.
 

 On the 22d day of June, 1861, the vessel cleared at Havana for Falmouth, England, and for orders. Protest of the master, dated at Newport, P. I., on the 12th day of July, 1861, states, “that on Tuesday, the second day of that month, at sea, in about latitude thirty one degrees, longitude sixty-nine degrees, during a squall, the ship was caught aback, and having gained sternway, wrenched the rudderhead and carried away the foreyard, when, finding the. ship unfit to perform the voyage, squared away for Newport,” where the ■vessel arrived on the eleventh of the same month.
 

 Suggestion on the part of the United States is, that the location of the vessel, as described in the protest at the time when she was obliged to abandon the voyage and sail for a port of refuge, shows that she was on the direct route to the coast of Africa; and it must be admitted that there is great force in the suggestion.
 

 4. Libellants deny that the charter is a
 
 bond fide
 
 instrument, and as showing that it cannot be so regarded, they refer to the fact that the alleged charterer agreed to give fifteen hundred dollars more for the charter than the owner asked for a full title of the vessel. Theory of the libellants is that the whole transaction is a simulated one, and that the charter was manufactured to conceal the real fact that the owner had sent his vessel to Havana for the purpose of completing her fitment for the contemplated slave-trading voyage. They insist that his original design was to set up the theory of a sale, but that he was obliged to abandon that theory, lest he should destroy the claim of the appellants under their attachments.
 

 Support to the theory that the charter-party is not a
 
 bond
 
 
 *399
 

 fide
 
 instrument is certainly derived from the evidence in the case, that fourteen packages of stores for the vessel were shipped at New York, on the 10th of May, 1861, by the order of the owner, and consigned to the master. None of the packages were manifested, and the directions were that they should not be, and they were not landed at Havana, but were transhipped directly on board the Reindeer. Strong confirmation of that theory is also derived from the subsequent conduct of the owner after the seizure of the vessel. Irrespective of any or all previous theories, he at once, on the arrival of the vessel at Newport, assumed to treat the vessel and cargo and the whole enterprise as his own, as appears by his letter to the master, and by his conduct in the payment of the wages and expenses of the voyage.
 

 "When the vessel was seized, there was found on board by the marshal a sealed package, containing what is called by the witnesses a sea letter. Such a letter is designed, as represented by one of the witnesses, for the protection of the vessel in case she should be boarded by an officer of the customs, or an officer of a man-of-war. This sea letter was dated the 22d day of June, 1861, and stated that the destination of the vessel was not to Falmouth but to St. Antonio, one of the Cape de Verd islands, and the custom-house permits found on board contained the same representation.
 

 On the other hand, the voyage in the manifest is described as one from Havana to Falmouth, and it reports two “ passengers, cabin, Pedro G-aroia and Hato A. Pinto.” They were on board the vessel at the time of the seizure, and the one first named admitted that he had once been to the coast of Africa for slaves, but insisted that he was a mere passenger. Pinto at first admitted that he was supercargo; but afterwards, when he was arrested, denied that he was anything but a passenger. Neither of these persons was produced as a witness by the claimants, and no satisfactory explanation is given why they were not called.
 

 Claimants not only failed to call either of the supposed passengers who were on board, but they have neglected to call the master or any one of the crew, and the evidence-
 
 *400
 
 shows that the master has absconded. ■ They have introduced no one who knew what the real destination of the vessel was except one of the consignees, and his testimony-is unsatisfactory, and, in many respects, utterly incredible.'
 

 5. Unusual as was the conduct of the owner of the vessel, in omitting to present any claim for the same, it was even more so in the course adopted by him to enable the attaching creditors to obtain judgment against him for a debt contracted only four days before he was sued. On the day after the arrival of the vessel, the master borrowed- thirty dollars of Messrs. T. & J. Coggeshall to pay the crew; and on the fifteenth of July following, he borrowed of. the same parties the sum of eighty dollars; and on the eighteenth of the same month the further sum of fifty dollars for the same purpose. He paid the crew, and they were discharged; and thereupon he drew a sight-draft on the owner to reimburse the lenders, and the amount was promptly paid. . Attaching creditors, James E. Ward & Co., sued out a writ of attachment against the owner of the vessel, on the 19th day of July, 1861, alleging the damages in the sum of five hundred dollars; but the amount for which the suit was brought is only for the sum of three hundred and fifty dollars, and consists of two items, one dated July the thirteenth, and the other July the fifteenth, and both are for cash advanced to the master of the. vessel to pay off the crew.
 

 Plaintiffs in that suit, it will be remembered, were the agents of the owner in putting up and despatching the vessel at the inception-of the voyage, and they were the shippers of the hardware and the
 
 tasajo,
 
 as appears by the manifest. Return was made upon the attachment suit on the 20th day of July, 1861, and the proofs show that the defendant in the suit refused to allow counsel to continue the case, and consented that the plaintiffs should have judgment. Taken as a whole, the circumstances attending that suit and its prosecution afford strong grounds to infer that the purpose of the suit was to furnish the means of defeating the jurisdiction of the District Court.
 

 Both the District and the Circuit Courts were of the
 
 *401
 
 opinion, that the facts and circumstances to which reference has been made afford a clear presumption, that the allegations of the libel are true, and in,¡that view of the case-we entirely .concur. Doubt cannot be-.entertained that the evidence of guilty purpose;, from the inception of the voyage to the time when the vessel was compelled by stress of weather to sail for.Newport, is abundantly sufficient to overcome every presumption of innQ.cen.ce to which any such voyage oan be entitled, and to establish the truth of the charges under consideration as contained in the libel.
 

 Suits of this description necessarily give rise to a wide range of- investigation, for the reason, that the purpose of the voyage is directly involved in the issue. Experience shows that. positive proof in such cases is not generally to be expected, and for that reason among others the law allows a resort to circumstances as the means of ascertaining the truth. Circumstances altogether inconclusive,-if separately considered, may, by- their number and joint operation, especially when corroborated by moral coincidences, be sufficient to const!-' tute conclusive proof. Applying that rule to the present case, we have no hesitation in coming to the conclusion that the finding in the court below was correct.
 

 II. Appellants contend, in the second place, that the District Court had no jurisdiction of the case. 1. Because the vessel and cargo, as they insist, were in the custody of an officer óf a State court at the time the monition was served by the marshal. '2. Because the wrongful acts, if committed at all, were committed in the District of New York, and not in the- district where the libel was filed.
 

 Three answers are made by the United States to the.first objection to the-jurisdiction of the court.
 

 Eirst. They -deny-the fact,'.that either the vessel or eai’go vras ever in the exclusive possession of the officer of the State court.
 

 Secondly. They insist that the attachment suit was a collusive one between the appellants ■ and the'-owner of the vessel, and that the same was only prosecuted as the means-of defeating the jurisdiction of the Federal courts.
 

 
 *402
 
 Thirdly. They contend that the possession of the sheriff under civil process from a State court, as supposed by the appellants, will not prevent the operation of the laws' of the United States in suits of forfeiture, or oust the admiralty •jurisdiction of the Federal courts in a case like the present, where the forfeiture is made absolute by statute, because in such a case the forfeiture relates back to the time of the commission of,the wrongful acts, and takes date therefrom, and not from the date of the decree.
 

 1. Undoubtedly it was decided by this court in the case of
 
 Taylor et al.
 
 v.
 
 Carryl,
 

 *
 

 that where a vessel had been seized under a process of foreign attachment issuing from a State court, the marshal, under process from the admiralty, issued from the District Court of the United States, in a íibel for seamen’s wages, could not take the property out of the custody of the sheriff; but in that case the sheriff had the prior and exclusive possession of the property.
 

 The undisputed facts, however, in this case are otherwise. Immediately on the arrival of the vessel at Newport the collector placed a custom-house officer on board of her, and that officer wa,S’- in the actual possession of the vessel and cargo when the attachment was made. Both vessel and cargo were then in .the custody of the United States, and so in fact remained until the same were sold by the marshal by the order of the Circuit Court. By order of the district attorney, the collector, some days before the libel was filed, made a formal seizure of the vessel for a violation of the slave-trade acts; and at that time the revenue officer who had taken possession of the vessel before she was attached, still had her in custody, and he remained in possession of her until the sale, when the proceeds were paid into the registry of the court. Under these circumstances it is clear, we think, that the case of
 
 Taylor et al.
 
 v.
 
 Carryl
 
 does not apply, and that the seizure was rightfully made.
 

 2. Our conclusion also is, from the evidence, that the suit of the appellants was a collusive one; and upon that ground
 
 \
 
 
 *403
 
 also we are inclined to hold that the objection of the appellants must be overruled. Having come to that conclusion, it is unnecessary to examine the third answer presented by the United States to this objection.
 

 III. Remaining objection of the appellants to the jurisdiction is, that the wrongful acts, if any, were committed out of the district where the libel was filed. But there is no merit in the objection, as the rule is well settled, that libels
 
 in rem
 
 may be prosecuted in any district where the property is found. Such was the rule laid .down by this court in the case of
 
 The Propeller Commerce ;
 

 *
 

 and it is clear, beyond controversy, that the present case is governed by the rule there laid down.
 

 The decree of the Circuit Court is therefore
 

 Affirmed.
 

 *
 

 1 Stat. at Large, 347; 3 Id. 451.
 

 *
 

 20 Howard, 583.
 

 *
 

 1 Black, 581.