UNITED STATES *v.* THE MARY N. HOGAN.

(*District Court, S. D. New York.* November 23, 1883.)

1. HOSTILE EXPEDITION—SECTION 5283, REV. ST.—NEUTRALITY—SEIZURE.
    An expedition organized and dispatched from our ports, in separate parts, to meet at a common rendezvous on the high seas, and thence proceed to acts of hostility against a friendly power, is within the prohibition of section 5283 of the Revised Statutes.

2. SAME—CASE STATED.
    Where the tug M. N. H. was purchased in New York, by persons interested in the Haytian insurrection, and there fitted out for sea, though having no arms on board, and simultaneously a large quantity of arms and ammunition were bought by the same persons and dispatched on board the schooner E., under instructions and preconcerted signals for transferring them, near Hampton roads, to a steamer which was to receive them there, *held*, upon the facts, that the steam-tug M. N. H. was fitted out with the intent and purpose of receiving these arms and ammunition at Hampton roads, and proceeding thence on a hostile expedition in aid of the insurgents in Hayti, and was therefore justly seized and forfeited to the government, under section 5283.

Information for Violation of Neutrality Laws.
*Elihu Root,* Dist. Atty., for the United States.
*George H. Forster,* for claimant.

BROWN, J. On the twentieth day of July, 1883, the steam-tug Mary N. Hogan was seized at this port by order of the collector. The information in this case was thereupon filed to procure her condemnation, upon two grounds: *First*, for violation of section 5283 of the Revised Statutes, in being fitted out with the intent that she should be employed to commit hostilities against the recognized government of Hayti; and, *second*, for a violation of sections 4189, 4142, in being knowingly and fraudulently registered in the name of John H. McCarthy, under a false oath that no subject or citizen of any foreign prince or state was directly or indirectly interested in the vessel. The Mary N. Hogan was a steam-tug of about 37 tons register, 90 feet long, 20 feet beam, and 9 feet depth of hold, built for ordinary towing service about the harbor of New York, and in no respect distinguishable by any peculiarities from the numerous other tugs of her class in this port. Her draught, loaded, was about 9 feet, and her full speed, when in good order, 10 to 11 knots. When seized on the twentieth of July she was nearly ready for sea, it having been given out that she was to proceed to Port Antonio, Jamaica, for the purpose of assisting in raising the steamer Calvert, which had been sunk in that harbor by a collision. At the time of seizure she had all her coal on board for the voyage. She had previously received some repairs, none of a very important character, the chief of which were replacing a somewhat decayed beam by a new one, and the addition of a keel condenser for the purpose of obtaining fresh water on the voyage. Several examinations by experts on behalf of the government previous to the seizure failed to discover any repairs or preparations indicating any intended service in military or naval operations. No arms, ammunition, or other warlike appliances were on board. From the evidence it clearly appears that though the Hogan was wholly unadapted to effective naval operations against any considerable organized opposition, she could be of the greatest service to the insurgents by her light draught and considerable speed in landing or taking off men at unprotected points on the coast of Hayti by watching her opportunities of running in and out, as well as in offensive demonstrations against defenseless parts of the island, with little to fear from the slight naval resources of the lawful government. *U. S.* v. *Rand,* 17 FED. REP. 142.

The facts upon which the prosecution relies are mainly as follows:

Since March, 1883, an insurrection has been in progress in Hayti by armed insurgents at war with the pre-existing government, which had been and still is alone recognized in this country as the lawful government of that island. The insurrection originated at the port of Miragoane, through an expedition which started from Philadelphia on March 15, 1883, upon the steamer Tropic, with arms and ammunition, nominally bound for Kingston, Jamaica. The Tropic did not go to Kingston, but went to the island of Inagua, about 30 miles from Hayti, where she took on board Gen. Boyer Bazelais, the

recognized leader of the rebellion, with 75 or 100 armed men, and about the same number afterwards from an English steamer at sea, and then proceeded to the port of Miragoane, where Gen. Bazelais, with all the men, arms, and ammunition were landed about daybreak, and the insurrection successfully inaugurated. Bazelais, before leaving Jamaica, had supplied one Simon Soutar, a merchant of Kingston, who was interested in the Haytian insurrection, with money for the purpose of purchasing arms and ammunition. The arms and ammunition which went out upon the Tropic were purchased in New York by Henry A. Kearney, upon Soutar's order, from Joseph W. Fraser, of this city, and were shipped by the latter to Philadelphia, and there shipped on board the Tropic by Kearney. See *U. S.* v. *Rand, supra.*

In June, 1883, Mr. Soutar came to this city. Acting in his behalf, Kearney entered upon negotiations for the purchase of a tugboat, and on the twenty-third of June made a contract with one Moran for the purchase of the Hogan, at the price of $11,600. Prior to this time Soutar had been made acquainted with John H. McCarthy, a roving and adventurous navigator, experienced in blockade running, and made three times a prisoner during the war of the rebellion, who had served at Sebastopol and in the Mediterranean, and was familiar with the waters of the West Indies. Upon the purchase of the Hogan all the money was supplied by Soutar to Kearney, who paid it to Moran, while the contract of purchase and the bill of sale of the vessel were taken in the name of McCarthy. On Monday, the twenty-fifth of June, the register of the vessel was made in the custom-house in the name of McCarthy, upon a bill of sale delivered to him at that time, and McCarthy at the same time executed a bill of sale from himself to Philip William Abbott, a resident of Kingston, Jamaica, also interested in the Haytian insurrection, and described by McCarthy as the partner of Soutar. At the time of the registry of the vessel in the name of McCarthy, he made oath that "no citizen or subject of any foreign state or prince was interested in the vessel directly or indirectly." The bill of sale to Abbott was never registered. McCarthy testifies that he supposed it to be a mortgage; that he understood previously that he was to take the title of the Hogan and execute a mortgage back for the full price; that he did not expect to pay for the vessel in any other way than by the mortgage. McCarthy states that he was engaged to act as captain of the tug, to assist in raising the Calvert at Port Antonio, and to do towing around the island, for which he was to receive $125 per month. After the purchase of the Hogan, McCarthy went into possession as captain, took her to Astoria, where the repairs above mentioned were made, and afterwards obtained a supply of coal at Hoboken, whence he returned to pier 28, East river, to take in additional stores preparatory to departure upon his voyage. McCarthy procured seamen and engineers for the voyage; but all the bills, with

unimportant exceptions, were paid by Kearney, with money supplied by Soutar, and Kearney had the general direction and supervision of the Hogan in this port.

While these preparations on the Hogan were in progress, Soutar purchased from Fraser various arms and ammunition, to the value of $7,000, including rifles, a twenty-pound army Parrot gun, a three-inch Parrot gun, and two field carriages. They were in part shipped by Fraser at pier 28, East river, on board the schooner E. G. Erwin, which cleared for Richmond and sailed on July 18th, two days before the seizure of the Hogan. The rest of the arms, being left behind through the Erwin's sailing earlier than Fraser had expected, were forwarded by rail and taken on board the Erwin at Lewes, Delaware. The shipment of the arms on board the schooner Erwin was arranged by one George W. Brown, a ship-broker, at the request of Kearney, who knew Brown to have been previously successful in arranging for the shipment of warlike material to the Cuban insurgents. Brown prepared private signals and instructions for the captain of the Erwin, to the effect that the arms and ammunition in question should be transferred in the vicinity of Hog island, Hampton roads, to a steamer which would meet him there and give the signals agreed on, and that the arms and ammunition should be delivered on presentation of the schooner's receipts and payment of his charges. A copy of these instructions and signals was given to Kearney. The Hogan was seized on the 20th. No vessel met the schooner near Hog island or Hampton roads, as was designed, and the Erwin, after cruising several days in that vicinity, and finding no vessel to answer the concerted signals, went on her way to Richmond, for which place she had other goods. Shortly afterwards the arms and ammunition purchased by Soutar were seized by the federal authorities at Richmond; but before this was known to Kearney he had told Brown that no vessel had met the Erwin in Hampton roads; that she had taken the arms to Richmond; and that he desired Brown to arrange for their transport to the West Indies. Brown thereupon made partial arrangements, at Kearney's request, to take the arms and ammunition to the Island of Navassa, a small guano island, without harbor or ordinary habitations, between Jamaica and Hayti, and about 40 miles from the latter. Intelligence of the seizure of the arms at Richmond put an end to further negotiations on that subject.

Four witnesses gave direct testimony of the statements of McCarthy as to the destination of the Hogan. McCormick, a constable of Brooklyn, testified that McCarthy told him that he expected to clear the next Wednesday for Hayti, and that he expected to take two guns aboard on the way. Mary Costigan testified that McCarthy engaged her husband for first engineer, and also to serve as a gunner, in which capacity he had previously served; and that he said he was going to Miragoane, Hayti. Her husband and one Cox testified that Mc-

Carthy said they were going to fight Hayti, and would take in arms on the way.

The claimant gave no evidence touching the destination of the arms and ammunition purchased of Fraser; and, as regards the destination of the Hogan, he relied solely upon the statement made to various persons in the course of the negotiations for the purchase of the Hogan, and on the testimony of Capt. McCarthy that she was designed to go to Port Antonio for the purpose of raising the wreck of the Calvert. Neither the claimant Abbott nor Soutar appeared as witnesses, nor was their testimony taken by commission.

A letter from Soutar to Kearney, dated July 3, 1883, was introduced in evidence, the material parts of which as as follows:

"Soutar & Co.          KINGSTON, 3d July, 1883.
                   "Jamaica.

 "Address for Telegrams,
   "Soutar, Jamaica.

"*H. A. Kearney, Esq.*, 1400 *Sixth Avenue, New York:*

"DEAR SIR· The writer duly arrived on Friday, and we are now anxiously waiting advices from you, as we expected everything would have been ready and dispatched ere this. We telegraphed you yesterday, 'Salaried standard, Calvert's matter,' but up to present, 1 P. M., have no reply. We should like the Calvert's matter put in hand as early as possible. If you have already procured two schrs., long 3-masters, of from 300 to 350 tons register, then get made at Perry & Jones', Wilmington, Del., or at any of the machine shops, 4 4-inch screws about 12 feet long, with a square thread of 3-8 of an inch, and 5-8 deep, with a lever of 8 feet long. * * * See that everything is completed and dispatched as early as possible. * * * Captain Edwards, whom the writer saw at B. I. Werberg's, asked $1,000 a month for 320-ton schooners, but would take less. * * * We think the plan of raising her with screws the best, and would like to get under way as soon as possible. If you can get letters out to us by Warner & Merritt's steamers, write us by that way as well as by mail, and perhaps Mr. Merritt may be able to help you in getting the schooner or screws, or in some other way, in the Calvert's matter. She has been lying under water too long already, and we are very anxious to get to work as early as possible. * * *"

The claimant also proved the purchase by Soutar of the wreck of the Calvert for $500; that in July, Kearney was negotiating in New York for the purchase or lease of two three-masted schooners, to be used in raising the Calvert, which, however, were not obtained here; that four beams and jack-screws, with chains, were in August shipped to Port Antonio, for the purpose of raising the Calvert; that the Erwin carried some arms and ammunition on the voyage above referred to, consigned, by way of Richmond, to *bona fide* purchasers in the interior; and that great alterations and strengthening would be necessary in the Hogan to make her fit for any considerable permanent naval operations, or for any successful contest with armed antagonists.

No testimony was offered by the claimant to show what vessel was expected to receive the arms and ammunition from the Erwin in

Hampton roads; nor was any explanation offered of the title of the vessel being first taken in the name of McCarthy and then by a secret bill of sale transferred to Abbott.

The only rational inference that can be drawn from the above facts is that the Hogan was designed to be used for the conveyance of arms and ammunition in aid of the insurrectionists in Hayti, and for other aid, and such hostile demonstrations as she was fit to make against the defenseless parts of the coast. The circumstantial evidence, together with the direct evidence of four witnesses, strongly sustain this conclusion; while the ostensible purpose of the Hogan's voyage has little that is natural, plausible, or probable to sustain it; and other circumstances, easy for the claimants to have explained if the Hogan was destined upon a legitimate business, are left wholly unexplained. Expeditions of this character are highly penal. Vessels cannot be fitted out or be cleared without more or less publicity. It is to be expected, therefore, in every case of such unlawful expeditions, that some pretext will be given out which must have connected with it some circumstances of reality to be of any value; and the question is necessarily presented whether the ostensible purpose of the voyage, more or less plausible, is the *bona fide* and sole object, or only a cover for departure upon a hostile expedition, as in the case of the Tropic.

All the circumstances in this case seem to me to show that the ostensible purpose for which the Hogan was going was a pretext, and not the real object of her voyage. While some direct evidence may not be wanting, yet for the most part cases of this sort must depend upon circumstantial evidence. In the *Slaver Cases*, 2 Wall. 401, the court say: "Ships of this description necessarily give rise to a wide range of investigation, for the reason that the purpose of the voyage is directly involved in the issue. Experience shows that positive proof in such cases is not generally to be expected, and for that reason, among others, the law allows a resort to circumstances as the means of ascertaining the truth. Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." So, in Judge BETTS' charge to the grand jury, as quoted in Wharton's Criminal Law, in relation to the neutrality act, he says:

"It must be manifest to you, gentlemen, that these criminal designs, if entertained, will be managed with much disguise and caution; it is not probable that soldiers will be openly enlisted, or officers commissioned, or vessels freighted to transport munitions of war or men to the field of action. Pretenses and coloring will be employed to mask the real object the parties to such criminal projects contemplate. But if you discover the purpose really to be to supply the means of hostile agression against Cuba, then all persons connected with it, and promoting it, will be answerable for the violation of the laws of the United States in the undertaking, the same as if their proceedings had been openly and avowedly intended for a hostile invasion, and waging war on that community."

In the present case there are four lines or groups of evidence which all concur in the conclusion I have stated: (1) The circumstances connected with the simultaneous purchase by Soutar of a large quantity of arms and ammunition and of the Hogan, and their intended dispatch about the same time with the intended transhipment near Hog island; (2) the absence of explanations within the power of the claimant, if the expedition were legitimate and lawful; (3) the direct evidence inculpating the Hogan; and (4) the improbabilities that the purchase of the Hogan was simply to raise the wreck of the Calvert, as suggested.

1. Soutar was the agent of Bazelais, the leader of the insurrection in Hayti, and had enabled the latter successfully to inaugurate the revolt through an expedition which Soutar had organized in this country, with arms and ammunition purchased in New York and shipped at Philadelphia on the Tropic, under a false clearance for Kingston, in March, 1883. In June, three months afterwards, we find Soutar himself in this country, again purchasing $7,000 worth of arms and ammunition, which subsequent events clearly proved were destined for the support of the insurrection in Hayti, and simultaneous therewith negotiating, through Kearney, for the purchase of a steam-tug, ostensibly to go to Port Antonio, Jamaica. These arms and ammunition were shipped on board the schooner Erwin at pier 28, which cleared on the eighteenth of July, under secret instructions to transfer them at Hog island, near Hampton roads, to a steamer which was to appear for them there, and receive them on concerted signals. These instructions and signals were arranged at Kearney's request and communicated to him, and he also had the general superintendence of the fitting out of the Hogan for sea. Two days afterwards we find the Hogan at pier 28, on the eve of her departure, with all her coal on board, ostensibly bound for Jamaica, like the Tropic, and with only some few stores or provisions remaining to be taken aboard, and prepared to sail in time to reach the rendezvous near Hog island. The Hogan is seized on the 20th, and no steamer or other vessel meets the Erwin near Hog island, as carefully planned, though the Erwin cruises up and down for nearly a week, and the arms, contrary to design, are carried on to Richmond. The seizure of the Hogan has apparently disconcerted the carefully devised plans of Soutar and Kearney in the purchase of a large quantity of arms, and the simultaneous purchase and fitting out of the tug. These are at least circumstances of an extremely suspicious character, and if unexplained, when explanation is in the power of the claimant, they necessitate the inference that the Hogan was the vessel designed to receive the arms near Hog island for use against Hayti. *Slaver Cases,* 2 Wall. 350, 401; *Clifton* v. *U. S.* 4 How. 242.

2. No explanations, however, are offered, either as to the purchase of this large quantity of arms and ammunition, or of the failure of any vessel to meet the Erwin at Hampton roads. If these arms and

ammunition, to the amount of $7,000 in value, had been destined for any other use than in aid of the Haytian insurrection, it would have been easy for the claimant to show it; and so as regards the vessel which was to meet the Erwin. The whole arrangement had been made at Kearney's request, and he received a copy of the instructions and signals as agent of Soutar, and could easily have shown that the Hogan was not the vessel intended to receive these arms, if such were the fact. If it were a vessel from a foreign port that was to meet the Erwin, that fact could have been shown without evidence of any violation of our law; while it is improbable in the last degree that Soutar and Kearney were at this very moment engaged in fitting out and sending from this country some other vessel than the Hogan, which does not appear in the case, to meet the Erwin at Hampton roads. They were fitting out the Hogan; they had purchased her at the price of $11,600, and she was about to sail at the appropriate moment to meet the Erwin, according to instructions and concerted signals clearly proved; and the inference is irresistible, in the absence of all explanation, and of proof of any other vessel designed for that purpose, that the Hogan was the vessel designed for that rendezvous, and to proceed thence to assist the Haytian insurgents. These arms and ammunition weighed but 20 tons, scarcely more than the coal she would consume on her way to Hampton roads, and they were easily within her power to take.

3. Four witnesses testified to the direct statements of Capt. McCarthy showing that the Hogan was being fitted out to aid the insurrection; that Cox and Costigan were wanted by Capt. McCarthy because they had had experience in the navy as gunners, although he refused to tell them the name of the vessel on which he desired to ship them, it being before the Hogan was actually purchased, but while negotiations were pending for the purpose of getting some steamer; and that he told them that the vessel was going to Miragoane; that there would be fighting there; and that arms were to be transferred to him on the way. Capt. McCarthy denies the statements; and it is urged that it is extremely improbable that he would make any such disclosures, even if true. But this argument is weakened by the fact which appeared in evidence, and which to some extent fell under the observation of the court, that Capt. McCarthy, besides apparently being usually voluble in conversation, became much more so when under the influence of liquor, to which he was occasionally addicted, so as not to be restrained by the ordinary considerations of prudence and caution. Some of the statements made by him, given in evidence, were made when under the influence of liquor; for that reason the weight to be attached to them would be undoubtedly diminished; and though the general character of the four witnesses referred to is not of the highest credibility, still all this testimony falls in completely with the other circumstances of the case; and, as there is no impeachment of these witnesses, their testimony cannot be disregarded,

but must be held as at least somewhat strengthening the conclusion to which all the circumstances point.

4. The improbabilities of the ostensible purpose of the Hogan, namely, to raise the wreck of the Calvert at Port Antonio, Jamaica. I do not question, upon the evidence, that Soutar had purchased this wreck for $500, and was proposing to raise it. The Hogan alone would, however, be of no service in raising such a wreck. She was wholly unadapted for such a service, and incapable of doing it. The plan actually proposed for raising this wreck, as the evidence showed, was to procure two long three-masted schooners, to be placed one on each side of the wreck, with four beams running across, each furnished with a jack-screw and chains, by means of which the wreck should be raised. The Hogan might be made useful to some extent in merely towing the schooners into place, in towing away the wreck when raised, and serve as a convenient tender in the progress of the work; but there was no evidence that aid of a character so entirely subordinate could not be procured at Port Antonio from some other tugs at a comparatively trifling expense; and it would seem in the highest degree improbable that, for services so comparatively slight and subsidiary, Soutar should have expended $11,600 in the purchase of the tug Hogan. The Hogan, moreover, was equipped for sea long before the other preparations for raising the wreck were made. Some negotiations for the hiring of schooners were entered into by Kearney here, but they failed, either the schooners or the price being unsatisfactory. By Soutar's letter to Kearney from Kingston, July 3d, it appears that he arrived there from New York on the twenty-ninth of June, from which it may be inferred that he left New York immediately after the purchase of the Hogan, and of the arms and ammunition above referred to. In this letter he desires that "Calvert's matter be put in hand as early as possible," and gives directions to have screws and beams made for use in that business if schooners are obtained. These beams or screws were not procured or shipped until August, nearly a month after the Hogan was ready to sail. It is manifest, therefore, that this voyage of the Hogan was long before there were any preparations for raising the Calvert, and could not have been intended for that purpose.

Again, had this been the real object of the Hogan, it is improbable that the case would have been left with such very loose and inadequate evidence of it. As it stands, the evidence consists only of McCarthy's statements of what Soutar told him, and of other casual statements in the course of the negotiations for the purchase of the Hogan. It is quite possible, and even probable, that it may have been designed to use the Hogan to assist in raising the Calvert when the other preparations were ready; so that the vague evidence of the kind referred to, though not false, is in no way incompatible with the primary and direct object of the voyage being to aid in the insurrection. If, moreover, the object of this voyage was a legitimate com-

mercial venture, no reason appears why Soutar, having paid $11,600 for the Hogan, should have the title taken and registered in the name of Capt. McCarthy, and afterwards, by a secret bill of sale, transferred to his partner, Abbott. Nor are the character and antecedents of Capt. McCarthy such as would render it probable that he would be employed as the captain of a tug-boat to be used as a mere tender in raising the Calvert or in towing about the island; nor does the business of towing appear to form any part of Soutar's ordinary business.

The evident disguise and concealment under which the Hogan was purchased, and her title taken and kept; the failure to exhibit by any direct or satisfactory proof any legitimate business at the time she was fitting out; the absence of all evidence from the parties immediately and most deeply interested, when their testimony might easily have been procured had her destination been a legitimate one; together with the strong circumstantial evidence above stated, sustained by the direct evidence of witnesses as good as could be expected to be employed in such an expedition,—leave no doubt in my mind that the Hogan was fitted out for the purpose of receiving, near Hampton roads, the $7,000 worth of arms and ammunition which had been dispatched by the Erwin to that rendezvous two days before, and of proceeding thence to Hayti, in aid of the insurgents there in the various ways for which she was suited.

The evidence shows, therefore, a hostile expedition organized and dispatched from our ports in separate parts, to be united at a common rendezvous on the high seas, and to proceed thence to Hayti, in completion of the original hostile purpose with which the different parts were dispatched from our shores. Such an expedition is as much within the prohibition of section 5283 of the Revised Statutes as if all its parts were united and complete upon one single vessel at the moment of its departure. *U. S.* v. *Quincy*, 6 Pet. 445; *U. S.* v. *Gooding*, 12 Wheat. 472; *The Meteor*, (per BETTS, J.) 245–250.

A decree for the condemnation of the Mary N. Hogan must therefore be awarded.