**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**George AYALA, Raul Alfredo Portillo,
and Oscar Reza,
Defendants–Appellants.**

No. 88–1880
**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Oct. 16, 1989.

Salvador C. Ramirez, El Paso, Tex., for defendants-appellants.

LeRoy Morgan Jahn, Asst. U.S. Atty., Helen M. Eversberg, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before POLITZ, GARWOOD and JOLLY, Circuit Judges.

GARWOOD, Circuit Judge:

Defendants-appellants George Ayala (Ayala), Raul Alfredo Portillo (Portillo), and Oscar Reza (Reza) appeal their convictions for conspiracy to possess with intent to distribute, and for possession with intent to distribute, one hundred pounds of marihuana in violation of 21 U.S.C. §§ 841(a)(1) and 846, contending that the evidence adduced at trial was insufficient to support their convictions[1]. We reject this contention and affirm.

## Facts and Proceedings Below

On March 10, 1988, after a tip from an informant that Ayala was trafficking in narcotics, U.S. Customs Service Special Agent Jimmy Searls (Searls) commenced surveillance of Ayala's activities, ultimately following him to an El Paso self-storage rental facility. At this point, Searls was unable to obtain a position from which to observe Ayala's actions inside the facility.

Later that day, Fred Shroeder (Shroeder), an investigator with the Customs Service, summoned Searls to the self-storage facility to show him a test vial containing debris found outside storage unit D–13 that had tested positive for marihuana. Although Searls was unable to detect a marihuana odor emanating from D–13 that evening,[2] a Customs Service dog alerted at the door of the unit. As a result, the Customs Service rented a nearby unit from which agents could view unit D–13.

Searls testified that five days later he observed Ayala arrive at the storage unit under surveillance and open his car trunk, which Searls noticed contained a blue, hard-sided suitcase. Ayala opened the valise, exposing a black, plastic garbage bag surrounded by white towels that Searls believed were positioned to cushion the bag. Ayala then unlocked the door to unit D–13 with a key and entered it. From his vantage point, Searls was able to see inside the unit and notice that it housed a large scale and two dark-colored garbage bags, one of

---

1. Appellants' sole other point on appeal is their challenge to the constitutionality of the federal sentencing guidelines followed by the district court in determining their sentences. Because the Supreme Court has since upheld the constitutionality of the guidelines, this challenge is rejected without further discussion. *See United States v. Mistretta*, —— U.S. ——, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989); *United States v. White*, 869 F.2d 822 (5th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 3172, 104 L.Ed.2d 1033 (1989).

2. Searls testified, however, that he smelled marihuana at unit D–13 and also that he had found marihuana residue in front of it on subsequent occasions.

which Ayala weighed on the scale. Searls testified that after weighing the bag, Ayala completed his activity at D–13 for the day by storing the blue suitcase inside the unit and locking the door.

Shroeder testified that on March 22 he called the Customs Service canine unit to the self-storage rental facility in question to examine the exterior of unit D–13 and that, once again, the dog alerted at its entrance. Three days later, Shroeder observed Ayala return to unit D–13 to retrieve from it an unspecified number of bags, a few of which were plastic and others of which were white and marked with green writing. Ayala placed all of the bags inside the passenger's side of his car. Shroeder and Searls followed Ayala from El Paso as far as the U.S. Border Patrol checkpoint near Truth or Consequences, New Mexico. There, agents let Ayala pass after an apparently cursory inspection of his automobile.[3]

Upon returning to El Paso, Shroeder and Searls searched the garbage dumpster at the self-storage facility and discovered several black garbage bags and white nylon ones bearing green writing on the exterior similar to that seen by Shroeder earlier in the day on the white bags Ayala loaded in his car. Shroeder testified that the green markings appeared to indicate weights in kilograms. The white bags contained a green residue that smelled like marihuana and tested positive as such.

On April 12, 1988, while conducting a surveillance of Ayala's home, Shroeder and Searls observed a black Ford Bronco arrive at the house.[4] Shroeder testified that he saw a man get out of the automobile and approach the house. He then discerned the same man talking to Ayala in his carport. Searls did not observe this initial contact between the two men, but he later saw two men, who appeared to him to be Mexican, leave the carport and enter the Bronco.[5]

Searls also saw Ayala exit the house carrying two suitcases that he loaded in the rear of the Bronco.[6]

Searls trailed the Bronco and its three passengers to the Amtrak passenger terminal in El Paso and followed the three inside the building. There Ayala split from Reza and the other passenger, both of whom entered the ticket line. From a place in line behind them, Searls was able to overhear Reza purchasing train tickets, although he was unable to make out the destination. After the suspects departed, Searls questioned the ticket agent and learned that Reza had purchased three tickets to Phoenix, Arizona, in the name of "L. Portillo." Fearing that a narcotics shipment would soon be leaving the city, Searls requested assistance from the El Paso Police Department, the United States Border Patrol, and the Drug Enforcement Agency (DEA).

Later in the day on April 12, the same black Ford Bronco returned to the Amtrak station, this time with four passengers. Border Patrol agent Jesse Shaw (Shaw) testified that the four—Ayala, Reza, Portillo, and co-defendant Victor Hernandez (Hernandez)—unloaded luggage from the vehicle and separated into two groups. Shaw followed Hernandez and Portillo, who was carrying a maroon suitcase as well as a light blue one, into the terminal. As the two neared the boarding area, Shaw and El Paso Police Sergeant Paul Irwin (Irwin) stopped them and requested identification, which they provided. When the officers asked Hernandez and Portillo to produce their tickets, Hernandez replied that only Portillo was traveling. Hernandez also answered Shaw's inquiry directed to Portillo about his destination, stating that Portillo was departing for a family-related visit to Phoenix. Shaw testified that Portillo said little, although when he spoke he did so in English. Because Hernandez

---

3. The inspection did, however, include an examination of the interior of the trunk of Ayala's car.

4. The Bronco was registered in the name of Reza's mother.

5. One of the men was later identified as appellant Reza.

6. Searls testified that he thought the suitcases were empty because of the way Ayala was able to "swing[ ] them in[to] ..." the rear of the Bronco.

insisted on doing most of the talking for the pair, the officers attempted to separate the two and interrogate them a few feet apart.

Shaw questioned Hernandez and asked him how he arrived at the train station. Hernandez responded that he and Portillo had hired a taxi; however, following Shaw's retort that he had seen the suspects show up at the station in a Bronco, Hernandez admitted that the pair had in fact arrived in the manner Shaw described and that he was at the station simply to drop off the appellants.

The officers' attempt to conduct separate interrogations failed when Irwin asked Portillo for consent to search his two suitcases because Hernandez again interrupted the questioning, advising Portillo in Spanish not to give consent. Shaw testified that during the officers' repeated requests for consent, Portillo said only a few words, appeared nervous, and seemed to look to Hernandez for counsel about what to say. When the officers asserted that they wanted Portillo to speak for himself, Hernandez told Portillo not to act until he saw a lawyer. Following an inspection of the suitcases by a narcotics dog that resulted in its alerting to them, the officers seized the suitcases and arrested Hernandez and Portillo.

El Paso Police officer Armando Fonseca (Fonseca) stopped the other two suspects, Reza and Ayala, as they entered the boarding area of the station and asked them if they would answer a few questions. Both agreed. Fonseca testified that Reza had two suitcases with him that appeared to be heavy because of the way he was carrying them, and that Ayala was toting a garment bag and a briefcase.

Fonseca began the questioning by asking Reza if he was boarding the train and, if so, to produce his ticket. Reza answered affirmatively and, with his hand visibly shaking, he presented Fonseca a ticket, which was issued in the name of "L. Portillo" for one-way passage to Phoenix. When Fonseca asked for other identification, Reza, still visibly nervous, displayed a driver's license bearing his actual name.

Fonseca testified that Reza was unable to explain the discrepancy in the names.

After answering Fonseca's inquiry about the length and nature of his travel by stating that he was departing on a short trip to visit his father, Reza was unable to explain why he was carrying such large suitcases. Reza then responded to Fonseca's question about the nature of his association with Ayala by denying having ever seen him before.

Fonseca completed his interrogation of Reza by informing him that he was a narcotics officer and wanted to obtain his consent to search the suitcases. Reza rejoined that he did not understand the meaning of consent and asked if Fonseca had a search warrant. After failing to obtain consent to open the suitcases, Fonseca turned his attention to Ayala, who had paced nervously throughout the interrogation.

Ayala also held a one-way ticket to Phoenix in the name of "L. Portillo," although he asserted that his destination was Casas Grandes. In addition, after producing a driver's license in his own name, Ayala explained the difference in the names by asserting that someone else had purchased his train ticket for him.

Ayala maintained that he was traveling to Casas Grandes on business to examine property there for a Dallas developer. However, he was unable to provide Fonseca with the names of any of his contacts in Casas Grandes. Ayala also denied knowing Reza or the other two suspects and stated that he had arrived at the terminal by taxi. He further described the purported taxi driver's appearance to Fonseca, without realizing that Fonseca had earlier seen him arriving in the Bronco.

Fonseca testified that following the questioning and an examination of the suitcases by the narcotics dog, which alerted to them, Ayala reacted to the test results and his imminent detention by shaking his head "in a dejected manner." After search warrants were obtained, authorities found one hundred pounds spread among the four suitcases seized from Portillo and Reza. Though the suitcases contained some other items, the marihuana accounted for most of

their weight. No illicit substances were discovered in Ayala's bags. Searls further testified that he examined the seized luggage and noted that one piece looked identical to the blue, hard-sided suitcase he had seen in Ayala's possession on March 15 at the self-storage facility. Except for essentially fruitless cross-examination of the government's witnesses, there was no defense evidence.

Following a bench trial, Ayala, Portillo, and Reza were convicted as charged on both counts. This appeal follows.

## Discussion

Appellants' sole contention on this appeal[7] is that the evidence was insufficient to support their convictions. In evaluating such a challenge, we must examine the evidence as a whole in the light most favorable to the verdict and must afford the government the benefit of all reasonable inferences and credibility choices drawn therefrom. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Kim,* 884 F.2d 189 (5th Cir.1989); *United States v. Whittington,* 783 F.2d 1210, 1216 (5th Cir.1986). This Court recognizes that it is the " 'sole province' " of the trier of fact " 'to weigh the evidence and the credibility of the witnesses.' " *United States v. Martin,* 790 F.2d 1215, 1219 (5th Cir.1986) (quoting *United States v. Davis,* 752 F.2d 963, 968 (5th Cir.1985)). We will hold that the evidence is sufficient to sustain the verdict if a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *United States v. Palella,* 846 F.2d 977, 981 (5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 162, 102 L.Ed.2d 133 (1988). When making such a determination, " '[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.... ' " *United States v. Henry,* 849 F.2d 1534, 1536 (5th Cir.1988) (quoting *United States v. Bell,* 678 F.2d 547, 549

(5th Cir.1982) (en banc), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)).

We observe more generally that what the fact finder "is permitted to infer from the evidence in a particular case is governed by a rule of reason," and that fact finders may properly " 'use their common sense' " and " 'evaluate the facts in light of their common knowledge of the natural tendencies and inclinations of human beings.' " *Henry,* 849 F.2d at 1537. Further, as the Supreme Court long ago remarked, "[c]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." *Coggeshall v. United States (The Slavers),* 69 U.S. (2 Wall.) 383, 17 L.Ed. 911, 914–15 (1865).

 To establish guilt of conspiracy to possess marihuana with intent to distribute under 21 U.S.C. §§ 841(a)(1) and 846, the United States must prove beyond a reasonable doubt the existence of an agreement that entails a violation of the narcotics laws, the defendants' knowledge of the agreement, and their voluntary participation in it. The prosecution, however, does not need to present evidence showing an overt act by the defendants in furtherance of such a conspiracy. *United States v. Hernandez–Palacios,* 838 F.2d 1346, 1348 (5th Cir.1988); *United States v. Gardea Carrasco,* 830 F.2d 41, 44 (5th Cir. 1987). In determining the existence of a conspiracy agreement, the trier of fact may rely on circumstantial evidence, including presence and association, along with other evidence. *See United States v. Graham,* 858 F.2d 986, 991–92 (5th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989); *United States v. Ascarrunz,* 838 F.2d 759, 763 (5th Cir.1988). The elements of the conspiracy charge "may be inferred from the 'development and collocation of circumstances.' " *United States v. Lentz,* 823 F.2d 867, 868 (5th Cir.1987) (quoting *United States v. Ver-*

**7.** Apart from their attack on the constitutionality of the sentencing guidelines, see note 1, *su-* *pra.*

*gara,* 687 F.2d 57, 61 (5th Cir.1982)). Although to be guilty a defendant must voluntarily participate in the conspiracy, he need only play a minor role in the overall scheme. *United States v. Gonzales,* 866 F.2d 781, 788 (5th Cir.1989).

■ In order to prove that the accused were guilty of the underlying offense, 21 U.S.C. § 841(a)(1), the United States must establish beyond a reasonable doubt that they (1) knowingly (2) possessed marihuana (3) with intent to distribute it. *See United States v. Richardson,* 848 F.2d 509, 511 (5th Cir.1988); *United States v. Williams–Hendricks,* 805 F.2d 496, 500 (5th Cir.1986). Possession of the illicit narcotic may be actual or constructive, constructive possession being "the knowing exercise of, or the knowing power or right to exercise, dominion and control over the proscribed substance." *Gardea Carrasco,* 830 F.2d at 45 (quoting *United States v. Glasgow,* 658 F.2d 1036, 1043 (5th Cir.1981)). In addition, possession and intent to distribute may be established by circumstantial evidence, and intent may be inferred as well from possession of a large amount of the illicit substance. *United States v. Prieto–Tejas,* 779 F.2d 1098, 1101 (5th Cir.1986).

■ Ayala argues that the United States failed to prove any element of the conspiracy charge and that it did not establish that he had possession of the marihuana. To the contrary, the evidence against Ayala appears to have been more than sufficient to support his conviction. That evidence included testimony linking Ayala to a self-storage facility unit that he controlled, to which narcotics dogs alerted and in front of which government agents discovered marihuana residue. In addition, the evidence indicated that the white bags Ayala was seen carrying into the unit were similar to those containing traces of marihuana that agents discovered in a nearby garbage bin. The unit contained a scale. Further testimony disclosed that the blue suitcase Ayala stored at the unit on March 15 appeared identical to one holding marihuana that

agents seized at the train station on April 12.

The evidence also revealed that early on April 12, agents observed Ayala accompany Reza to the train station and wait while Reza stood in the ticket line. Later in the day, they watched Ayala, Portillo, and Reza arrive at the station together in the black Bronco and unload luggage from its rear. When considered with the prior evidence, as well as evidence that Ayala was arrested carrying a train ticket bearing the same name as those tickets held by Reza and Portillo and that he exhibited nervous behavior during questioning and lied to Fonseca about his association with his co-defendants, it is clear that sufficient evidence existed establishing Ayala's guilty knowledge of and participation in the charged conspiracy. *See Richardson,* 848 F.2d at 509 (nervousness at checkpoint); *United States v. Romero–Reyna,* 867 F.2d 834, 836 (5th Cir.1989) (lying evidence of guilty knowledge).

■ Although Ayala was not physically carrying the marihuana-laden suitcases when stopped by Fonseca, the trier of fact could have reasonably determined that he had constructive possession of the proscribed substance inside them. Ayala's link to the conspiracy as well as the evidence that one of the suitcases seized by agents had previously been in his possession allow the inference that Ayala had the knowing right to exercise dominion over the marihuana.[8] *Gardea Carrasco,* 830 F.2d at 45. The evidence is also sufficient to show Ayala's guilt of the substantive offense on an aiding and abetting basis or under the rationale of *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946).

■ Reza and Portillo also contend on appeal that the prosecution failed to prove any element of the conspiracy charges against them. They further maintain that although they were in possession of the marihuana when arrested, the prosecution

---

**8.** With regard to all three appellants, the intent to distribute the marihuana can be inferred from the quantity of marihuana found in the suitcases, one hundred pounds. *Prieto–Tejas,* 779 F.2d at 1101.

failed to present evidence establishing that they were in knowing possession of the substance. With respect to Reza, once again, ample evidence exists to support his convictions on both counts. Even though Reza never appeared at the facility where the marihuana was stored, other sufficient evidence indicated his participation in the conspiracy and his knowledge of what he was carrying. Agents observed him arrive at Ayala's home on April 12, pick up Ayala and two apparently empty suitcases, and drive with Ayala to the train station. There, Reza purchased the three tickets to Phoenix bearing identical names, two of which Reza and Ayala were holding when arrested later in the day at the station. When Fonseca stopped Reza, whose two suitcases were later found to contain marihuana, he acted nervously and lied to Fonseca about his association with Ayala. *See Richardson,* 848 F.2d at 513 (nervousness); *Romero–Reyna,* 867 F.2d at 836 (providing false information). Given the foregoing as well as the fact that Reza, himself, was planning to travel on the train that day with the suitcases, rather than simply helping apparently innocent others with their luggage at the station, the trier of fact could have reasonably inferred that Reza had knowing possession of the marihuana he was carrying and that he voluntarily participated in the conspiracy.

■ Portillo entered the scenario later than Ayala and Reza and, as a result, the evidence against him is not as strong, although it is sufficient to sustain his convictions. Agents observed him arrive at the station on April 12 in the vehicle with Ayala, Reza, and Hernandez and take two suitcases, which later were discovered to contain marihuana, into the terminal. All three appellants had passage booked to Phoenix, yet Portillo entered the terminal separately from Ayala and Reza and appeared to be traveling apart from them. During questioning, Portillo seemed nervous and was reluctant to answer the officers' questions, relying on Hernandez to deal with them. Finally, like Reza, Portillo himself intended to travel on the train that afternoon with the suitcases and was not merely helping apparently innocent others with their luggage at the station. A collocation of the circumstances would allow a trier of fact to conclude beyond a reasonable doubt that Portillo knew what he was carrying and that he voluntarily participated in a conspiracy with Ayala and Reza to possess marihuana with the intent to distribute it.

### Conclusion

In conclusion, we find that the evidence was sufficient for the district court to convict Ayala, Portillo, and Reza on both counts.

AFFIRMED.