**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Arnoldo VILLASENOR and Fidel Villasenor, Defendants–Appellants.**

No. 88–2838.

United States Court of Appeals,
Fifth Circuit.

Feb. 12, 1990.

J. Roberto Flores, McAllen, Tex. (court-appointed), for defendants-appellants.

Paula C. Offenhauser, Frances H. Stacy, Asst. U.S. Attys., Henry Oncken, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before GEE, REAVLEY and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Defendants-appellants Fidel (Fidel) and Arnoldo (Arnoldo) Villasenor (collectively, the Villasenors) appeal their convictions, following a jury trial, for conspiracy to possess marihuana with intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846. Arnoldo also appeals his conviction for possession of marihuana with intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2. They contest the sufficiency of the evidence supporting the convictions. We affirm in part and reverse in part.

### Facts and Proceedings Below

Viewed most favorably to the government, the evidence reflected the following.

From approximately 1984 through at least January 1988, Arnoldo and Rosa Maria Alaniz (Alaniz), whom the jury could have found was Arnoldo's common-law wife, leased a house together in McAllen, Texas. Both Arnoldo and Alaniz signed the original lease agreement for the house. Although the water and telephone bills were in Alaniz's name, Arnoldo provided the money—in cash—to pay for the utility bills, as well as the $475 monthly rent, through January 1988. No one paid the February 1988 rent. The owner of the house thereafter named Arnoldo in a suit

for nonpayment of rent. A number of photographs of the house were placed in evidence, revealing it to be a medium-sized, single-story structure.

Besides Arnoldo and Alaniz, Arnoldo's brother—Fidel—had the only keys to the house. Beginning in the spring of 1987, Fidel lived in a bedroom in the house. During this time, the Villasenors split at least some of the bills relating to the house, such as the approximately $400 monthly telephone bill. At some point in December 1987, the beds were removed from Fidel's bedroom,[1] and Fidel moved into an apartment in McAllen. "Once in a great while" during January 1988, however, Fidel would fall asleep watching television on a sofa in the living room of the house.

Most of the time when Fidel was there and always when he was not there, the bedroom door was locked.[2] On the inside of the bedroom door was some form of a push-button lock. Although the Villasenors knew how to unlock the bedroom door from the outside, Alaniz testified she did not know how to do so and never went into the room during that time. Arnoldo and Alaniz frequently argued over Fidel's living in the house and keeping his bedroom door locked, but Arnoldo told Alaniz that it was none of her business. Frequently, Alaniz would be absent from the house for long periods, though not overnight, and her testimony can arguably be understood as saying that some of these absences were at Arnoldo's request.

Beginning in mid-November 1987, Arnoldo began to spend at least some of the evenings at the apartment of Matilda Fass (Fass) in McAllen. Arnoldo, however, continued to spend at least the daytime hours with Alaniz at the house they leased and in which Arnoldo's clothes were located. Although the lease agreement for Fass's

apartment listed "Arnold," as well as Fass and her two children, as living in the apartment, the agreement was only in Fass's name and was signed only by Fass. Moreover, although the electricity bill for the apartment was in Arnoldo's name, Fass paid the rent and the utility bills relating to the apartment.

On February 1, 1988, Arnoldo voluntarily entered an alcohol detoxification program. Alaniz visited Arnoldo at the program. She picked him up from the program on February 8. Arnoldo dropped off Alaniz at the house and apparently drove to Fass's apartment where he spent the evenings of February 8 and 9. Alaniz did not see Arnoldo again at the house until approximately 5:00 a.m. on February 10.

At some point during the time Arnoldo was enrolled in the detoxification program, Fidel came over to the house as Alaniz was leaving to visit Arnoldo. Alaniz turned her car around and returned to the house where she found Fidel standing by the door to his former bedroom. Fidel turned away from the door and picked up the telephone. Alaniz never saw Fidel enter the bedroom after he stopped residing there in December 1987. Moreover, she also never saw either Fidel or Arnoldo take anything in or out of the bedroom, such as any bundles or similar items.

Arnoldo was employed by his father as a produce truck driver. This was seasonal work. Thus, business was "very slow" at times, and Arnoldo drove only two or three loads during many months. Fidel was employed as a mechanic.[3] Because Alaniz had more legible handwriting than the Villasenors, they occasionally asked her to make various numerical records for them, some of which related to monetary expenditures.[4]

---

1. The beds were removed purportedly to be replaced by new beds, but the beds were not replaced prior to the Villasenors' arrest in February 1988 for the charged offenses.

2. Alaniz also testified that the bedroom door was locked sometimes because her daughter had a tendency to destroy property.

3. It is unclear from the record how much income Arnoldo and Fidel received from these jobs.

4. The exact nature of the numerical information recorded by Alaniz is not clearly shown. One of the DEA agents testified that they seized some form of ledgers from the house. Pursuant to the Villasenors' oral pretrial motion *in limine* contesting the relevancy of these ledgers, which

On February 10, 1988, agents of the federal Drug Enforcement Administration (DEA) searched the house pursuant to a warrant. Alaniz, as well as a man identified as Roger Longoria (Longoria), were inside the house at the time. Inside the locked former bedroom of Fidel, the DEA agents found various bundles of marihuana, which were wrapped in trash bags, cellophane, or both, and which had a gross weight of approximately 1,069 pounds; an industrial strength vacuum cleaner; plastic self-sticking paper, which a DEA agent testified was of a kind commonly used for packaging marihuana; and numerous trash bags and rolls of silver duct tape. The floor of the bedroom was covered with a large tarp. Inside the house, the agents also found a diamond bracelet with initials matching Arnoldo's ("A.V."), which was appraised at $3,930.

Arnoldo, Fidel, Alaniz, Longoria, and five named others were subsequently indicted for possessing marihuana with intent to distribute it on or about February 10, 1988; and for conspiring, among themselves and with others known and unknown, to do so from on or about February 3 to on or about February 10; and for distribution of marihuana within 1,000 feet of a public school on or about February 10, *see* 21 U.S.C. § 845a(a). The government subsequently dismissed charges against all of the defendants, except for the Villasenors. As to Alaniz, the dismissal was in exchange for her testifying at the Villasenors' trial.

The district court granted the Villasenors' motion for acquittal on the third count concerning marihuana distribution near a public school, in light of the government's concession at trial that there was no evidence of any distribution on or about February 10, 1988. The jury convicted Arnoldo of possession of marihuana with intent to distribute it and of conspiracy to do so. The jury also convicted Fidel on the conspiracy count, but acquitted him on the possession count. The district court sentenced Arnoldo to concurrent terms of eighty-five months' imprisonment on each count, followed by concurrent four-year terms of supervised release on each count, and sentenced Fidel to eighty months' imprisonment, followed by four years' supervised release, on the conspiracy count. The court also imposed a fifty dollar special assessment on each count of conviction. This appeal followed.

## Discussion

The Villasenors challenge the sufficiency of the evidence supporting their respective convictions. In evaluating such a challenge, we examine the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the jury verdict. *See Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Lechuga,* 888 F.2d 1472, 1476 (5th Cir.1989). We will sustain the verdict if a rational trier of fact could have found the essential elements of the offense in question beyond a reasonable doubt. *See United States v. Ayala,* 887 F.2d 62, 67 (5th Cir.1989). In making such a determination, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

Generally speaking, "[w]hat a jury is permitted to infer from the evidence in a particular case is governed by a rule of reason, and juries may properly 'use their common sense' in evaluating that evidence." *United States v. Henry,* 849 F.2d 1534, 1536 (5th Cir.1988) (citation omitted). "As the United States Supreme Court remarked long ago, '[c]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences,

apparently contained entries prior to the dates on or about which the indictment alleges that a conspiracy occurred, the district court stated that three of the four ledgers were not relevant and that the government would have to ap-

proach the bench before attempting to introduce the fourth ledger as evidence. The government subsequently did not attempt to introduce any of the ledgers.

be sufficient to constitute conclusive proof.'" *Lechuga,* 888 F.2d at 1476 (quoting *Coggeshall v. United States (The Slavers, Reindeer),* 69 U.S. (2 Wall.) 383, 17 L.Ed. 911, 914–15 (1865)).

Arnoldo contests the sufficiency of the evidence as to his conviction for possession of marihuana with intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 18 U.S.C. § 2. To establish such a violation, the government must prove beyond a reasonable doubt that Arnoldo (1) knowingly (2) possessed marihuana (3) with intent to distribute it. *See Ayala,* 887 F.2d at 68. Possession may be actual or constructive. This Court has defined constructive possession as "ownership, dominion, or control over illegal drugs *or* dominion over the premises where drugs are found." *United States v. Onick,* 889 F.2d 1425, 1429 (5th Cir.1989) (emphasis in original); *see Ayala,* 887 F.2d at 68. All of these elements may be inferred from circumstantial evidence. *See Onick,* 889 F.2d at 1429, 1430–31; *Ayala,* 887 F.2d at 68. For example, a jury may infer intent to distribute from a defendant's possession of a large amount of marihuana. *See Ayala,* 887 F.2d at 68.

■ A number of factors, taken together, support Arnoldo's conviction on the possession count. He generally resided at the house in which the marihuana was found, at least through January 1988. He and Alaniz jointly signed the original lease agreement for the house. Arnoldo usually paid the rent, as well as the other bills relating to the house, in cash. No one paid the February 1988 rent for the house, and the owner of the house named Arnoldo in a suit for nonpayment of rent. Only the Villasenors and Alaniz had keys to the house. Moreover, only the Villasenors knew how to unlock the door to the bedroom in which the more than one thousand pounds of marihuana was located. This bedroom door normally was kept locked, and, when Alaniz complained about its being locked, Arnoldo told her it was none of her business. Although Arnoldo spent at least some of the evenings at Fass's apartment beginning in mid-November 1987, he generally spent at least the daytime hours at the house, where his clothes were kept.

Moreover, Arnoldo seemed to lack a legitimate means of income to support his expenses. For example, although Fidel split some of the bills with Arnoldo when Fidel lived at the house for a nine-month period in 1987, Arnoldo generally paid the $475 monthly rent, the approximately $400 monthly phone bill, and the other bills relating to the house. When the DEA agents executed the search warrant, they found a diamond bracelet with Arnoldo's initials appraised at over $3900 in the house. During the time that he leased the house, Arnoldo purportedly had only one job—driving a produce truck for his father. Because this was seasonal work and business was very slow at times, Arnoldo drove only two or three loads of produce during many months.

Further, DEA agents found not only various bundles of marihuana weighing over one thousand pounds in gross weight inside the room, but they also found, *inter alia,* an industrial vacuum cleaner, numerous trash bags, rolls of duct tape, and plastic self-sticking paper, which is commonly used to package marihuana.

Arnoldo stresses that he was confined in a detoxification program from February 1–8, 1988, that he spent the evenings of February 8 and 9 at Fass's apartment, and that he was not present at the house when the search warrant was executed. Alaniz testified, however, that Arnoldo was at the house at approximately 5:00 a.m. on February 10, the day the warrant was executed. Arnoldo also emphasizes that Alaniz never saw him take anything, such as bundles or similar items, in or out of the bedroom where the marihuana was found. Alaniz, however, testified that she frequently would leave the house, arguably at Arnoldo's request, and be gone for long periods of time.

Viewing the evidence presented most favorably to the government, a rational trier of fact could have reasonably inferred that Arnoldo knowingly possessed the marihuana in light of his dominion and control over the house in which it was contained. See,

*e.g.,* our recent opinion in *United States v. Onick,* 889 F.2d 1425 (5th Cir.1989). In *Onick,* this Court, *inter alia,* upheld the conviction of Tolliver but reversed that of Onick for possession of heroin and cocaine with intent to distribute it. Pursuant to a search warrant, police officers seized a "small amount" of heroin and cocaine and various items of drug paraphernalia "concealed" in a house in which both Tolliver and Onick were found when the warrant was executed. We concluded that the jury could infer that Tolliver lived in the house and constructively possessed the illegal drugs found therein:

> "The police found numerous receipts made out to Tolliver at the house address. They also found papers belonging to Tolliver, clothes labeled with his nickname, and prescription bottles in his name. In addition, Tolliver selected clothing from one of the closets to wear to the police station." *Id.* at 1430.

In light of this evidence establishing Tolliver's constructive, though not actual, possession, we further concluded that the jury could also infer that he "came across the drugs and drug paraphernalia scattered" throughout the house and, therefore, knew of the drugs. *Id.*

In contrast only tenuous evidence linked Onick to the house and the narcotics found therein:

> "First, the police discovered Onick on the premises dressed in her nightclothes when they searched the house. Second, a bedroom closet contained women's clothing. Third, a bedroom contained a photograph of Tolliver, Onick, and an unidentified man. Fourth, a locksmith testified that several months before the arrests in this case, Onick showed him where to install a safe on the premises, paid for the safe, asked him to make the receipt out to 'Al' (Tolliver's nickname),

and accepted the card with the safe combination on it." *Id.* at 1429.

We held that this evidence was insufficient to establish Onick's possession of the narcotics, noting that "[a] reasonable jury could not conclude that Onick exercised dominion or control over the premises" and that "[n]o evidence established that she lived in the house." *Id.*

Although Arnoldo was not present when the warrant was executed, the evidence presented against Arnoldo seems at least as strong as that against Tolliver in *Onick.* As discussed above, Arnoldo signed the original lease agreement for, usually paid the bills with respect to, kept his clothes in, and generally spent at least the daytime hours (including the early morning of the day in which the warrant was executed) at the house where one of the bedrooms contained the marihuana. The jury could have reasonably inferred that Arnoldo lived in the house, exercised dominion and control respecting it, and constructively possessed the marihuana there. Moreover, Arnoldo was the only person living there (after some time in December 1987) who knew how to unlock the door to the bedroom where the marihuana was located, and the various bundles of marihuana, which weighed over one thousand pounds in gross weight, were scattered throughout the bedroom in plain view.

Finally, in light of the large quantity of the marihuana, as well as the marihuana packaging material, found in the house, the jury could have reasonably inferred that Arnoldo had the intent to distribute the marihuana. *See Ayala,* 887 F.2d at 68 & n. 8 (intent to distribute inferable from possession of one hundred pounds of marihuana). We conclude that the evidence is sufficient to support Arnoldo's conviction for possession of marihuana with intent to distribute it.[5]

---

**5.** The Villasenors rely primarily on two cases— *United States v. Aguiar,* 610 F.2d 1296 (5th Cir.), *cert. denied,* 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 31 (1980), and *United States v. Pantoja–Soto,* 739 F.2d 1520 (11th Cir.1984), *cert. denied,* 470 U.S. 1008, 105 S.Ct. 1369, 84 L.Ed.2d 389 (1985). *Aguiar* is inapplicable to Arnoldo's challenge to his possession conviction. In *Aguiar,* this Court reversed one defendant's conviction

for *conspiracy* to distribute cocaine because of the insufficiency of the evidence with respect to any conspiratorial agreement on that defendant's part. The government did not appeal the defendant's acquittal as to a second count for possession of cocaine with intent to distribute it. *See Aguiar,* 610 F.2d at 1303–04.

■ Fidel challenges the sufficiency of the evidence supporting his conviction for conspiracy to possess marihuana with intent to distribute it. At oral argument, the government conceded that, in light of this Court's decision in *Onick*, 889 F.2d at 1429–30, 1432 (Onick's mere association with Tolliver and her mere presence in the house from which the illegal drugs were seized is insufficient to uphold her convictions, *inter alia*, for possession of heroin and cocaine with the intent to distribute it and conspiracy to do so), the evidence is insufficient to support Fidel's conspiracy conviction. We accept the government's concession, and accordingly reverse Fidel's conviction and sentence.

■ Finally, Arnoldo contests the sufficiency of the evidence supporting his conspiracy conviction. Arnoldo essentially contends that "it takes at least two to tango for conspiracy purposes." *United States v. Morgan*, 835 F.2d 79, 82 (5th Cir.1987). The government's concession as to Fidel—that the evidence is insufficient to prove that he conspired with Arnoldo (or with anyone else) to possess the marihuana with intent to distribute it—is necessarily also a concession that the evidence is insufficient to prove that Arnoldo so conspired with Fidel. *Cf. Onick*, 889 F.2d at 1432.[6] It is not, of course, a concession that the evidence is insufficient to show that Arnoldo so conspired with anyone else. There is, however, no evidence that Arnoldo conspired with any of those named in the indictment as coconspirators. Indeed, the evidence discloses nothing about any of them except Alaniz and Longoria. As to Alaniz, the government's theory of the case was that she, its star witness, was not a conspirator and did not know of the marihuana, and the evidence does not show otherwise. Though Longoria was present when the warrant was executed (as was Alaniz, but not Arnoldo), he was not in the locked room where the marihuana was, there was no evidence he had access to it, and the evidence indicated he did not have a key to the house. There is no showing of concert of action, much less agreement, on his part with Arnoldo, and his mere presence when the warrant was executed does not suffice to show that Arnoldo conspired with him.

As the indictment here alleged that the conspiracy also included "other persons known and unknown to the Grand Jurors," the government is not limited in its proof respecting Arnoldo to the other purported conspirators named in the indictment. As we said in *Onick*, "a jury can convict a defendant of conspiring with persons whose names are unknown ... if the indictment charges a conspiracy with unknown persons and evidence supports their existence and the existence of a conspiracy." *Id.*, 889 F.2d at 1432. We have upheld such drug conspiracy convictions in a number of cases where sufficient evidence

---

The Eleventh Circuit's decision in *Pantoja–Soto* is not binding on this Court and in any event its facts are materially different. Unlike the evidence presented against Arnoldo here concerning his leasing of and generally living in and controlling the house from which the marihuana was seized, insufficient evidence was presented in *Pantoja–Soto* to infer that the three defendants there constructively possessed and knew of the methaqualone boxes. For example, although the father of one of the three defendants owned the station in question, the court concluded that this fact, combined with the defendants' presence, was insufficient to infer the constructive possession of and knowledge of the methaqualone boxes by the owner's son. *See Pantoja–Soto*, 739 F.2d at 1525–27. *But see id.* at 1527–29 (Tjoflat, J., dissenting).

**6.** This is clearly distinct from the separate principle also stated in dicta in *Onick* that we "usually will not uphold a conviction of one defendant in a conspiracy prosecution when a jury acquits [all] the other alleged coconspirators." *Id. See also United States v. Sheikh*, 654 F.2d 1057, 1062 (5th Cir.1981), *cert. denied*, 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982); *Herman v. United States*, 289 F.2d 362, 368 (5th Cir.1961). That principle—essentially giving the defendant the "benefit" of inconsistent verdicts as to other defendants (or counts)—is of highly questionable validity in light of *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), and the earlier Supreme Court decisions reviewed therein, and for that reason was abandoned by the Eleventh Circuit in its en banc decision in *United States v. Andrews*, 850 F.2d 1557, 1558, 1560–62 (11th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 842, 102 L.Ed.2d 974 (1989). *See also United States v. Young Brothers, Inc.*, 728 F.2d 682, 688 (5th Cir.1984). However, it is not implicated in the present case.

linked the defendant with unknown coconspirators. *See, e.g., United States v. Price,* 869 F.2d 801, 804–05 (5th Cir.1989); *United States v. Almeida–Biffi,* 825 F.2d 830, 834 (5th Cir.1987), *cert. denied,* 485 U.S. 1010, 108 S.Ct. 1478, 99 L.Ed.2d 706 (1988); *United States v. Klein,* 560 F.2d 1236, 1242 (5th Cir.1977), *cert. denied,* 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978). Further, unlike many other conspiracy offenses, section 846 does not require proof of an overt act in furtherance of the conspiracy. Any element of this offense may be inferred from circumstantial evidence. Moreover, the defendant need play only a minor role in such a scheme. *See Lechuga,* 888 F.2d at 1477; *Ayala,* 887 F.2d at 67–68.

However, the evidence presented against Arnoldo establishes neither the existence of any unknown coconspirators, such as buyers or sources,[7] nor any agreement or concert of action on Arnoldo's part with any such others. In comparable drug conspiracy cases where little to no evidence of other unknown coconspirators was presented, this Court has reversed the single purported conspirator's conspiracy conviction, even though affirming his conviction of the related substantive offense of possession with intent to distribute. *See, e.g., Onick,* 889 F.2d at 1432; *United States v. Hernandez–Palacios,* 838 F.2d 1346, 1349 (5th Cir.1988); *Morgan,* 835 F.2d at 82 (two hundred pounds of marihuana in car of which defendant was the driver and sole occupant); *United States v. Sheikh,* 654 F.2d 1057, 1062–63 (5th Cir.1981), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71

L.Ed.2d 852 (1982) (4.4 pounds of heroin shipped to defendant concealed in Koran display case).

Perhaps most closely on point is *Hernandez–Palacios.* There, the defendant-appellant Hernandez, accompanied by four codefendants, sought to bring two buses into the United States from Mexico, ostensibly to pick up a music group in Tucson or Las Cruces. Inspection at the border ultimately disclosed that the buses carried over one thousand pounds of marihuana, concealed in a hidden compartment and in sealed-off portions of the fuel tanks. Hernandez, who stated to the inspecting agents that he owned and was in charge of the buses, was convicted, among other things, of conspiracy to import the marihuana, conspiracy to possess it with intent to distribute, importing it and possessing it with intent to distribute. The four codefendants—two bus drivers and two "passengers"—who were also charged in the conspiracy counts, were granted judgments of acquittal in the district court. On appeal we affirmed Hernandez's conviction of the substantive counts of importation and possession with intent to distribute, but reversed his convictions on the two parallel conspiracy counts. In attempting to sustain Hernandez's conspiracy convictions, the government sought to rely on the indictment's unknown conspirator allegations,[8] pointing to statements by Hernandez that one "Elias" had rented the buses and that his brother owned one of them. We rejected this, stating:

---

7. We assume, *arguendo* only, that "Wharton's Rule" would not prohibit a conspiracy conviction on the sole basis of a two-party purchase of the marihuana. *See generally* 2 W. LaFave & A. Scott, *Substantive Criminal Law* § 6.5 at 119 & n. 285, 120, 121 (1986) (two party "buying and selling of contraband goods" not chargeable as conspiracy where those are substantive offenses). *See also Iannelli v. United States,* 420 U.S. 770, 95 S.Ct. 1284, 1292, 43 L.Ed.2d 616 (1975) (Wharton's Rule is a judicial presumption that may be overcome by appropriate indication of contrary legislative intent); *United States v. Prati,* 861 F.2d 82, 88 & n. 27 (5th Cir.1988) (suggesting inapplicability of Wharton's Rule); *Curtis v. United States,* 546 F.2d 1188, 1190 (5th Cir.), *cert. denied,* 431 U.S. 908,

97 S.Ct. 1705, 52 L.Ed.2d 393 (1977). *Cf. United States v. Michelena–Orovio,* 719 F.2d 738, 746–52 (5th Cir.1983) (those who conspire to import a twelve-ton load of marihuana into the United States and deliver it to others who plan to independently distribute it within the United States may be found guilty of a conspiracy to possess with intent to distribute).

8. The government and this Court apparently assumed that the acquittal of the four codefendants who accompanied Hernandez as a matter of law prevented them from being considered as those with whom Hernandez conspired. *Id.,* 838 F.2d at 1349. As to the validity of such an assumption, see note 6, *supra.*

"... the government's theory of the case at the trial strongly implied that no 'Elias' actually existed at all. Furthermore, even if there was a person named 'Elias' or one for whom this was a pseudonym, and even if Hernandez's brother owned one of the buses, these two single facts are not sufficient to permit the conclusion beyond a reasonable doubt that they together with Hernandez were members of a conspiracy to possess or import marijuana. Because of the insufficient evidence of any agreement, the trial court should have granted Hernandez's motion for judgment of acquittal on the two conspiracy counts." *Id.*, 838 F.2d at 1349.

Here, the government's case as to unknown coconspirators is even weaker. While we may well suspect that there likely were some, there is no concrete or specific evidence of any. There is simply no evidence at all of when, or how, or from whence the marihuana came to the locked room in the house.[9] And while, as noted, the evidence permits the finding that Arnoldo *intended* to distribute the marihuana, there is no evidence that he had actually taken any steps to do so, or entered into any agreements, tacit or otherwise, with others for this purpose.

Thus, we conclude, in light of the concession as to Fidel and following *Hernandez–Palacios*, that the evidence is insufficient to sustain Arnoldo's conviction for conspiracy to possess marihuana with intent to distribute it.

For the foregoing reasons, Arnoldo's conviction and sentence for possession of marihuana with intent to distribute it are AFFIRMED,[10] and Fidel and Arnoldo's convictions and sentences (and fifty dollar assessments) for conspiracy to do so are each REVERSED. The cause is REMANDED with directions to enter judgments accordingly.

AFFIRMED in part, REVERSED in part, and cause REMANDED with directions.

9. It is not common knowledge that one man cannot load one thousand pounds of marihuana in a pick-up truck, or carry it in two or three trips in an ordinary automobile. Arnoldo may have acquired the marihuana long before anything that might be reasonably encompassed by the indictment's "on or about February 3, 1988"; and he may have stolen it, or grown it, or acquired it in small increments, or acquired it in Mexico from one who thought he would resell it there.

10. As Arnoldo was sentenced under the Guidelines to identical concurrent sentences on each count, and both convictions involved the same underlying marihuana, resentencing on the possession conviction is unnecessary. *See Hernandez–Palacios*, 838 F.2d at 1351.