**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 14, 2012

No. 11-30361

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

LOUIS BOYD, JR.,

Defendant-Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:09-CR-63-1

Before REAVLEY, HAYNES, and GRAVES, Circuit Judges.

PER CURIAM:[*]

Louis Boyd, Jr., appeals following his conviction by a jury of conspiracy, substantive drug offenses, and firearms offenses. Boyd challenges his conviction and sentence. We agree that the evidence was insufficient to support the conspiracy conviction and therefore VACATE the district court's judgment and REMAND for re-sentencing.

Viewed in the light most favorable to the verdict, the evidence at trial showed the following. In December 2007, police in Norco, Louisiana, began an

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-30361

investigation of drug dealing around a Cart-N-Carry convenience store in the area of West B Street. As part of the investigation, undercover police officer Charles Franklin began frequenting the convenience store in an effort to identify the drug dealers. Officer Franklin testified that he would go to the store, purchase beer or cigars, and sit outside talking with others in and near the parking lot. During the investigation, Franklin met Brandi Johnson and her niece Angela Lindsay, both of whom were crack users and lived nearby. On four separate occasions, Lindsay and Johnson helped Franklin purchase small amounts of crack cocaine from Boyd. These purchases ranged in amount from $40 to $100 worth of crack.

On the first occasion on May 1, 2008, Lindsay was in the parking lot and asked if Franklin was "looking for something." When Franklin responded that he wanted "a C note," or $100 worth of crack, Lindsay and her boyfriend both made several calls from Franklin's cell phone in order to locate a source of supply. A short time later a man named Rodney Payne arrived, and Lindsay purchased $100 worth of crack from Payne with money supplied by Franklin. After Lindsay turned over the drugs to Franklin, the officer asked if Lindsay could purchase more drugs. She agreed and made more phone calls. Shortly thereafter, Boyd arrived in his truck. Lindsay purchased another $100 worth of crack from Boyd, again with money supplied by Franklin, which she then gave to the undercover officer.

The next sale occurred on June 11, 2008. Franklin again purchased beer and cigars at the store and waited outside. Johnson was there and asked if Franklin was looking for something. After Franklin answered affirmatively, Johnson went home for a few minutes and then returned, instructing Franklin to accompany her to New Sarpy. When Franklin asked why, Johnson said they were "going to get some stuff from Lou." Franklin and Johnson then drove a

No. 11-30361

short distance to Boyd's home on East Easy Street. Johnson went to the door and purchased $100 worth of crack from Boyd while Franklin waited in the car.

On June 24, 2008, Franklin met Johnson again at the Cart-N-Carry and said he was interested in purchasing $40 worth of crack. Johnson again "made a few phone calls," and Boyd arrived. Franklin gave the money to Johnson, who went to Boyd's vehicle and returned to Franklin with the drugs.

Finally, on August 14, 2008, Franklin conversed with Johnson about purchasing $60 worth of crack. According to Franklin's testimony, Johnson made a few phone calls, went home, and then came back asking for the money. The two then walked towards Johnson's house on West B Street. By this time, Boyd had arrived in his truck, whereupon Johnson walked up to the vehicle and leaned into the passenger side to purchase the drugs. Johnson instructed Franklin to follow her into her garage where she gave the drugs to Franklin.

On November 18, 2008, police executed a search warrant at Boyd's house on East Easy Street while Boyd was away from the residence. Upon entry, police discovered Boyd's cousin, Evelyn French, in a bedroom with a crack pipe. In the master bedroom, police found a digital scale, a razor blade, approximately 30 grams of crack, and a loaded handgun. Boyd was arrested shortly thereafter.

The indictment in this case charged Boyd with conspiracy to distribute and possess with intent to distribute fifty grams or more of cocaine base, four counts of distribution of cocaine base, possession with intent to distribute five grams or more of cocaine base, possession of a firearm by a convicted felon, and possession of a firearm in furtherance of a drug trafficking crime.

At trial, Lindsay and Johnson testified for the Government against Boyd. Both testified that they were drug users who purchased crack for themselves and for friends from Boyd, as well as from many other suppliers. They explained how they purchased crack on Franklin's behalf from Boyd on the occasions discussed above. Lindsay testified that she asked Officer Franklin to give her

a portion of the drugs that she purchased from Boyd but that Franklin refused and gave her cash instead.

Evelyn French also testified against Boyd. She was also a crack cocaine addict who purchased drugs both from Boyd and other drug dealers. French lived with Boyd for a short time at the East Easy Street address and testified that Boyd was dealing drugs from the home twenty-four hours per day, seven days per week. She explained that twenty to thirty people would come to the house daily to purchase drugs, some of whom spent as much as $300. She further testified that Boyd would replenish his drug supply either every day or every two to three days by driving to New Orleans to re-supply. French accompanied Boyd "on a few occasions." The jury convicted Boyd on all counts, and Boyd now appeals.

Boyd argues that the evidence was insufficient to support his conviction for conspiracy. He contends that there was no evidence of an "agreement" with anyone to distribute crack cocaine or that the agreement involved fifty grams or more as charged in the indictment. We agree that the evidence was insufficient.

Because Boyd never moved for judgment of acquittal, our review of the sufficiency of the evidence is to determine whether the conviction amounts to a manifest miscarriage of justice. *See United States v. Ochoa*, 667 F.3d 643, 647 (5th Cir. 2012). This standard will be met only if "'the record is devoid of evidence pointing to guilt or contains evidence on a key element of the offense that is so tenuous that a conviction would be shocking.'" *Id.* (quoting *United States v. Dowl*, 619 F.3d 494, 500 (5th Cir. 2010)).

In order to prove a conspiracy to distribute crack cocaine, the Government had to prove "(1) an agreement between two or more persons to violate the narcotics laws, (2) the defendant's knowledge of the agreement, and (3) the defendant's voluntary participation in the conspiracy. " *United States v. Zamora*, 661 F.3d 200, 209 (5th Cir. 2011) (internal quotation marks and citation

omitted). The Government need not show an express agreement, as "a tacit, mutual agreement with common purpose, design, and understanding" is sufficient. *United States v. Lewis*, 476 F.3d 369, 383 (5th Cir. 2007) (internal quotation marks and citation omitted). The agreement may be shown by direct or circumstantial evidence. *Zamora*, 661 F.3d at 209. A conspiracy may not be shown, however, by evidence that merely places the defendant "'in a climate of activity that reeks of something foul.'" *United States v. Fuchs*, 467 F.3d 889, 908 (5th Cir. 2006) (citation omitted). Nor may a conviction rest upon mere speculation and conjecture, or a piling of inference upon inference. *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996).

Here, the Government argues that the entirety of the circumstances shows that Boyd was involved in a conspiracy to distribute drugs with both known and unknown persons. It notes that Boyd had a supplier of narcotics in New Orleans; he engaged in hand-to-hand drug sales that were observed by police; he conducted a large volume of sales from his home; and he was found in possession of a large quantity of crack when police executed the search warrant. The Government contends that the conspiracy is shown from Boyd's delivery of crack to Johnson, Lindsay, and French, who in turn distributed the drugs to Officer Franklin or to their friends. The Government further argues that the evidence was sufficient to show that Boyd conspired with an unknown drug supplier in New Orleans. We are not persuaded.

The evidence was clearly sufficient to show that Boyd was a drug dealer and that he distributed crack as charged in the indictment, but it did not show that he was engaged in a conspiratorial agreement to violate the drug laws. None of the three women who testified against Boyd indicated that she worked for Boyd or solicited drug sales on his behalf, or otherwise acted in concert with Boyd to achieve a common purpose beyond their desire to purchase drugs from him. *See United States v. Cardenas*, 9 F.3d 1139, 1157 (5th Cir. 1993) ("An

No. 11-30361

agreement to violate narcotics laws may be inferred from 'concert of action.'");
*see also United States v. Mitchell*, 484 F.3d 762, 769 (5th Cir. 2007) (holding that
co-conspirators' concert of action allowed jury to infer an agreement where
defendants agreed to purchase crack cocaine together for distribution, agreed to
travel together, and agreed to have another co-conspirator conduct the
transaction on behalf of all of them).  The only motive apparent from the
testimony for the women helping Franklin was their hope that *Franklin* would
either share the drugs with them or pay them for their assistance.

The evidence showed that the women used Boyd as their source for drugs.
They all testified that they purchased crack not only from Boyd but also from
other drug dealers, and the Government specifically argued to the jury that the
women were merely drug users and that Boyd was the supplier.  The testimony
showed that when Officer Franklin purchased crack with their help, Johnson
and Lindsay made several telephone calls to find a source of supply.  Indeed, on
the first occasion, Lindsay arranged to obtain crack from another dealer, Rodney
Payne.  There was no indication that Boyd had an arrangement with the women
to distribute drugs other than as their street-level supplier, which is insufficient
because "[d]rug transactions alone do not constitute a conspiracy." *United States
v. White*, 569 F.2d 263, 268 (5th Cir. 1978); *see also United States v. Maseratti*,
1 F.3d 330, 336 (5th Cir. 1993) (noting that a buyer-seller relationship alone is
insufficient to show a conspiracy).  This principle is designed to prevent the
buyer-seller agreement that exists in every drug transaction from automatically
becoming a conspiracy to distribute drugs. *United States v. Delgado*, 672 F.3d
320, 2012 WL 574012, at *7 (5th Cir. 2012) (en banc).  The Government argues
that Boyd was obviously aware that the drugs purchased by Lindsay and
Johnson were meant for a third person and willingly provided the drugs for
delivery.  Even assuming Boyd knew that the women were purchasing the drugs
for Officer Franklin, however, that fact alone does not show that Boyd and the

No. 11-30361

women were knowingly participating in a plan to distribute drugs beyond a simple buyer-seller relationship. *See id.*

The Government further argues that the evidence showed Boyd conspired with an unknown drug supplier in New Orleans. "A person can be convicted for conspiring with unknown persons, if the indictment charges conspiracy with unknown persons and the evidence supports their existence and their complicity in the conspiracy." *United States v. Dukes*, 139 F.3d 469, 475 (5th Cir. 1998); *see also United States v. Villasenor*, 894 F.2d 1422, 1428 (5th Cir. 1990). For example, in *Dukes* we held that the evidence was sufficient to prove a conspiracy with an unidentified drug supplier who twice brought drugs for sale to a confidential informant in the defendant's presence and who paid the defendant a portion of the proceeds from one sale that was successfully completed. *Dukes*, 139 F.3d at 472, 475.

Here, the indictment charged that Boyd conspired with unknown persons, and Evelyn French testified that Boyd would replenish his drug supply by traveling to New Orleans, sometimes daily or every two or three days as necessary. But that is all that is known about Boyd's source. Although French accompanied Boyd "on a few occasions," she provided no other information about the identity or location of Boyd's source, or sources, of drugs. It is not known, for example, whether Boyd obtained his drugs from the same place in New Orleans or from the same person or persons. It is not known whether Boyd used a different source or sources on the occasions that French did not accompany him. Nor is it known whether Boyd obtained his drugs in bulk or in small quantities. French testified that she did not know how much Boyd purchased when he went to New Orleans. *Cf. Delgado*, 672 F.3d 320, 2012 WL 574012 at *7 (holding that evidence supported conspiracy with an unnamed drug supplier where *inter alia* defendant purchased "wholesale quantities of drugs" from the supplier); *see also United States v. Holloway*, 377 F. App'x 383, 387 (5th Cir. 2010) (holding that

7

evidence was insufficient to prove a conspiracy where the evidence did not show that individuals who sold drugs to the defendant knew that the drugs were meant to be resold).  In short, it cannot be inferred whether the unknown source or sources were part of a conspiracy or merely "arms-length" suppliers to Boyd. *See United States v. Klein*, 560 F.2d 1236, 1243 (5th Cir. 1977).  There is simply no evidence that Boyd's source or sources of drugs in New Orleans were "familiar with and actively cooperated [with Boyd] to achieve the object of the conspiracy." *Id.*; *see also Villasenor*, 894 F.2d at 1430 (holding evidence insufficient to prove conspiracy with unknown coconspirators where "we may well suspect that there likely were some, [but] there is simply no concrete or specific evidence of any").

We therefore conclude that the evidence was insufficient to prove that Boyd was guilty of a conspiracy.  The district court's judgment must therefore be vacated.  Because Boyd's conspiracy conviction was grouped with the remaining counts of conviction under the Sentencing Guidelines' grouping rules and affected the calculation of the mandatory statutory minimum, the case must be remanded for resentencing.  *See* U.S.S.G. §§ 3D1.2(d), 3D1.3(b).

Boyd raises two additional points on appeal.  First, he argues that the district court erroneously denied a motion for new trial based on the Government's failure to disclose evidence that Evelyn French acted as a confidential informant in an unrelated case after Boyd's arrest but before trial. We need not address his argument that this evidence could have been used to impeach French, however, because Boyd argues on appeal only that the impeachment is relevant to the conspiracy conviction, which we have already determined must be vacated.  Second, Boyd argues that the district court erred by failing to apply the Fair Sentencing Act of 2010 at sentencing.  The Act, which became effective prior to Boyd's sentencing but after his conduct of conviction, altered the amount of drug quantities necessary to trigger mandatory minimum sentences.  *See* Pub. L. No. 111-220, § 2(a), 124 Stat. 2372 (Aug. 3, 2010).  We are

No. 11-30361

bound by our circuit precedent to hold that Boyd's argument is foreclosed.  *See United States v. Tickles*, 661 F.3d 212, 214–15 (5th Cir. 2011), *pet. for cert. filed* (Dec. 15, 2011) (No. 11-8023).

VACATED AND REMANDED.

No. 11-30361

HAYNES, Circuit Judge, dissenting:

I respectfully dissent. I begin by agreeing with the majority opinion that the standard of review is plain error. I diverge from the majority opinion because I conclude that this standard is case-determinative here. We recently issued a lengthy and detailed *en banc* opinion, *United States v. Delgado*, 672 F.3d 320 (5th Cir. 2012), describing the standard of review for unpreserved sufficiency of the evidence challenges in a criminal case. In that case, we made clear that "such a claim [of insufficiency] 'will be rejected unless the record is *devoid of evidence* pointing to guilt or if the evidence is so tenuous that a conviction is shocking.'" *Id.* at 331 (citation omitted). In other words, Boyd "must demonstrate not just that the government's evidence of conspiracy was insufficient, but that it was *obviously* insufficient." *Id.* Furthermore, we recognized that although "there will necessarily be some 'close calls' on the issue of sufficiency," plain error review requires that such "close calls . . . be resolved in favor of the jury verdict." *Id.* at 332 n.11. While the evidence of conspiracy in this case is thin, the record is not "devoid of evidence," nor is the conviction shocking.

Boyd argues that the evidence against him supports only a finding that he was in a mere "buyer-seller" relationship with both his supplier and his purchasers. Accordingly, Boyd contends that the government's evidence was insufficient since it failed to establish a conspiracy separate and apart from the substantive drugs offenses of which he was convicted. However, his argument misunderstands the scope of the buyer-seller exception.

In *Delgado*, we addressed the limited scope of the (so-called) "buyer-seller exception" to the crime of conspiracy, stating that it "prevents a single buy-sell

agreement, which is necessarily reached in every commercial drug transaction, from automatically becoming a conspiracy to distribute drugs." *Id.* at 333; *see also United States v. Contreras*, 249 F.3d 595, 599 (7th Cir. 2001) ("[I]n order to establish a conspiracy, '[w]hat is necessary and sufficient is proof of an agreement to commit a crime other than the crime that consists of the sale itself.'" (citations omitted)); *United States v. Mercer*, 165 F.3d 1331, 1335 (11th Cir. 1999) (per curiam) ("'Where the buyer's purpose is merely to buy and the seller's purpose is merely to sell, and no prior or contemporaneous understanding exists between the two beyond the sales agreement, no conspiracy has been shown.'" (citation omitted)). As explained in *Delgado*, the buyer-seller exception is meant to "shield[ ] mere acquirers and street-level users, who would otherwise be guilty of conspiracy to distribute, from the more severe penalties reserved for distributers." 672 F.3d at 333.

However, in *Delgado*, we made it quite clear that this rule will not shield against a conspiracy conviction where the evidence supports the inference(s) that there was more than a mere buyer-seller agreement. *Id.* at 333-34. Indeed, it is well established that any element of the crime of conspiracy may be inferred from circumstantial evidence and that no evidence of overt conduct is required. *See, e.g., United States v. Schmick*, 904 F.2d 936, 941 (5th Cir. 1990); *United States v. Hernandez-Palacios*, 838 F.2d 1346, 1348 (5th Cir. 1988). In addition, circumstantial evidence can reveal several facts that, standing alone, may be insufficient, but taken together, can support the inference(s) that can be drawn in order for the jury to render a guilty verdict on a conspiracy charge. *See United States v. Vasquez*, No. 10-41270, 2012 WL 1216515, at \*4 & n.2 (5th Cir. Apr. 12, 2012) (per curiam). In other words, "'[a]lthough none of these . . . [alone] is dispositive, if enough are present and point to a concrete, inter-locking interest beyond individual buy-sell transactions, [the reviewing court] will not disturb the fact-finder's inference that at some point, the buyer-seller

relationship developed into a cooperative venture.'" *Contreras*, 249 F.3d at 599 (citation omitted).

*Delgado* involved a larger quantity of drugs, but it concerned a single transaction. With Boyd, we have a defendant who is selling drugs "24/7" such that the quantities, although small in each case, become large in the aggregate. This case does not involve a "one-off" buy-sell of a small amount but rather a retail distributor using "friends" as distributors and "people in New Orleans" as suppliers.

Thus, the evidence and the reasonable inferences therefrom demonstrate more than mere buyer-seller agreements. At trial, the government showed that the undercover officer gave Brandi Johnson ("Johnson") and her niece Angela Lindsay ("Lindsay") money to purchase crack cocaine for him. Johnson and Lindsay, who regularly purchased crack cocaine from Boyd, made four purchases for the undercover officer from Boyd, prompting Boyd on one occasion to question Johnson about whether the undercover officer "was a cop." Thus, Boyd knew that Johnson and Lindsay were buying from him to distribute to another person, supporting an inference of conspiracy. In addition, Johnson testified that she made purchases from Boyd oftentimes on a daily basis for herself as well as her friends, and that sometimes, she would hand Boyd the phone to arrange drug deals directly. Also, Johnson stated that as Boyd and Johnson became more comfortable with each other over the course of countless drug transactions, both the drugs she bought and received from Boyd and Boyd's business increased in amount and frequency, again supporting (though not compelling) a conclusion of conspiracy.

In addition, Lindsay testified that because the undercover officer refused to share the drugs but would give her some money, she would take the money to Boyd's house to buy herself drugs. Further, Lindsay stated that she would place a phone call to Boyd to arrange a purchase at his house, but usually

somebody other than Boyd would come to the door and consummate the transaction. Corroborating the latter statement, Boyd's cousin Evelyn French ("French") testified that before she moved into Boyd's house, a man nicknamed "Pa-Poochie" lived there with Boyd and would "watch the door."

Furthermore, French testified that after she moved in with Boyd, she observed Boyd selling drugs at his home and making deliveries twenty-four hours per day, seven days per week, and that she saw up to thirty people per day come to the home to buy as much as $300 worth of drugs per transaction from Boyd. In addition, French stated that whenever someone called her looking for drugs, she would refer them to Boyd and that she and Boyd would go together to consummate these transactions. Indeed, on direct examination by the government, French recounted one such incident where someone called her looking for drugs, French then contacted Boyd, who picked her up, and "we made the sale."

Moreover, French testified that Boyd would make trips to New Orleans to replenish his drug supply on an almost-daily basis. According to French, she would occasionally accompany Boyd on these trips, although she did not go inside. Furthermore, French testified that after Boyd was arrested, she went to the home of Boyd's mother, where Boyd maintained a locked bedroom. Whereas French initially claimed that only Boyd had a key to the locked bedroom in his house, French admitted that she had a key this locked bedroom, and that after Boyd's arrest, she and Boyd's other family members searched the room and found a quantity of drugs that was promptly flushed down the toilet (further conduct in support of a conspiracy and aiding in the cover-up).

As demonstrated from the foregoing, the record before us is not devoid of evidence that Boyd was knowingly involved in a conspiracy with both known and unknown persons. At a minimum, the jury could have inferred that Boyd sold drugs to people referred by Lindsay, Johnson, and French and that these three

women made referrals to Boyd because there was joint cooperation and a strong level of trust. *See United States v. Maseratti*, 1 F.3d 330, 336 (5th Cir. 1993) ("One becomes a member of a drug conspiracy if he knowingly participates in a plan to distribute drugs, whether by buying, selling or otherwise."); *United States v. Featherson*, 949 F.2d 770, 775 (5th Cir. 1991) ("Featherson had drug-related contacts with [a co-defendant] Ray, accepted referrals from Ray and had an apartment . . . near those frequented by [his co-defendants].").  Additionally, from Johnson's testimony that Boyd's business and the drugs she bought and received from Boyd increased in both amount and frequency as their relationship progressed, the jury could have inferred that they had an ongoing, mutually dependent relationship whereby Boyd made more drug sales and Johnson, on almost a daily basis, got a favorable price or more drugs than Boyd's other buyers. *See United States v. Dortch*, 5 F.3d 1056, 1065-66 (7th Cir. 1993).

Moreover, French's testimony that she and Boyd "made the sale," supports a perfectly reasonable inference that they shared a common purpose to distribute drugs to a third party.  Indeed, Boyd's nephew, Arthur Robertson, testified that even after Boyd was arrested, he saw French selling drugs out of Boyd's house.  In addition, the jury could have reasonably believed that French was serving as a lookout for law enforcement when she waited in Boyd's car outside the supplier's house in New Orleans.  That French lived with Boyd, accompanied him during drug deals and trips to replenish his supply, and had a key to Boyd's locked bedroom in his mother's home where he kept a supply of drugs that French and Boyd's other family members found and flushed, all support an inference of knowledgeable, voluntary participation since it would be unreasonable for anyone other than a knowledgeable participant to be present or have such access. *See United States v. Martinez*, 190 F.3d 673, 676 (5th Cir. 1999).  As the majority opinion notes, it is not necessary to prove an express agreement, *United States v. Lewis*, 476 F.3d 369, 383 (5th Cir. 2007), so the lack

of testimony by French describing a "let's be drug distributors together" conversation is not dispositive.

In addition, the jury could have reasonably concluded that Boyd also conspired with his unknown supplier: Boyd had $2,318 in cash when he was arrested; police found approximately 30 grams of crack cocaine, a loaded handgun, and various drug-dealing paraphernalia in his bedroom; Boyd possessed up to an ounce of crack cocaine at a time but never smoked crack cocaine; up to thirty people per day bought as much as $300 worth of crack cocaine per transaction at Boyd's home; Boyd sold crack cocaine at his home and made deliveries twenty-four hours per day, seven days per week; and Boyd traveled on nearly a daily basis to New Orleans to replenish his supply. Although the evidence regarding the exact nature of Boyd's relationship with his unknown supplier is admittedly cloudy, the jury still could have reasonably inferred from the evidence as a whole that Boyd's supplier was not an "arms-length" supplier. *See United States v. Mendez*, 496 F.2d 128, 130 (5th Cir. 1974) ("No formal agreement between the parties is essential to the formation of a conspiracy, for the agreement may be shown by concerted action, all the parties working together understandingly with a single design for the accomplishment of a common purpose." (citation omitted)); *see also United States v. Klein*, 560 F.2d 1236, 1243 (5th Cir. 1977). Indeed, the jury could reasonably find it incredible that Boyd could engage on a daily basis in enough buy-sell transactions with "arms-length" suppliers to sustain his business of selling crack cocaine twenty-four hours per day, seven days per week, to thirty people per day who were purchasing as much as $300 worth of crack cocaine at a time.

Taking all the evidence and the reasonable inferences therefrom together, by no means was the evidence that Boyd conspired with known and unknown persons insufficient, let alone "*obviously* insufficient." *See Delgado*, 672 F.3d at 331. This case presents a "close call." Our precedent requires that the "close

call" be resolved in favor of the jury verdict. *Id.* at 332 n.11. Accordingly, I respectfully dissent from the judgment vacating the conspiracy conviction.